191 So.2d 324 (1966)
Elton DEVILLE, Plaintiff and Appellee,
v.
AETNA INSURANCE COMPANY, Defendant and Appellant.
No. 1818.
Court of Appeal of Louisiana, Third Circuit.
October 20, 1966.
Dissenting Opinion October 24, 1966.
Rehearing Denied November 16, 1966.
Writ Refused January 20, 1967.
*325 Hall, Raggio & Farrar, by R. W. Farrar, Jr., Lake Charles, for defendant-appellant.
Nathan A. Cormier & Assoc., by Donald Carmouche, Lake Charles, for plaintiff-appellee.
Before CULPEPPER, TATE and HOOD, JJ.
CULPEPPER, Judge.
The plaintiff, Elton Deville, seeks damages for personal injuries sustained in an automobile accident. The defendant is Aetna Insurance Company, liability insurer of an automobile driven by Dr. Frank A. LaBarbera. A jury awarded plaintiff $17,000. Defendant appealed.
The factual issues are: (1) Was Dr. LaBarbera negligent in backing out of a driveway onto the highway in plaintiff's path? (2) Was the plaintiff guilty of any contributory negligence? (3) Was the jury award excessive?
There is also a very interesting question as to the admissibility in evidence of a police accident report.
The accident occurred on April 4, 1964 at about 10:15 p.m. It had been raining and the streets were wet. Plaintiff was driving his 1950 pickup truck in an easterly direction on U.S. Highway 90, which is also West Napoleon Street, near the city limits of Sulphur. Dr. LaBarbera was backing out of a private driveway on the south side of the highway and about 100 feet west of the highway's intersection with MacArthur Street. Plaintiff contends that when he reached a point about 50 feet from the driveway, Dr. LaBarbera suddenly backed out, blocking both lanes of the highway; that, in order to avoid hitting the automobile broadside, plaintiff swerved to the left and off the north side of the highway; that he went about 57 feet along the side of the highway; then struck a cross ditch, 2 feet deep, which knocked his truck back onto the highway and into the left side of the LaBarbera vehicle, which had by then driven to a point about 50 feet east of the driveway.
It is Dr. LaBarbera's contention that as he backed out of the driveway he looked to the west and saw the lights of plaintiff's approaching truck about ¼ mile away; that he backed out, turned and drove east on the highway; that when he reached a point about 100 feet east of the driveway plaintiff's truck struck the left side of his automobile.
The jury obviously found plaintiff's version of the facts was proved. Of course, the jury's verdict is presumed to be correct and the burden is on the defendant appellant to show manifest error therein. Cryer v. Ring, 149 So.2d 451 (La.App., 3rd Cir. 1963).
*326 After carefully reviewing the record, it is our conclusion there is ample testimony which, if accepted by the jury as true, would support its verdict. Let us review briefly some of the testimony.
Plaintiff's version of the accident was corroborated by two eyewitnesses. Mr. and Mrs. Burley J. Vidrine testified they had stopped on MacArthur Street, at its intersection with Highway 90, to wait for traffic to pass before turning to the east. They said the driveway in question is about 100 feet west of the point where they were stopped; they saw plaintiff's truck, with both headlights and cab lights burning, about 1½ blocks west of MacArthur Street; when plaintiff's truck reached a point from 40 to 60 feet from the driveway, Dr. La-Barbera's automobile suddenly "shot out" backwards across Highway 90; to avoid striking the LaBarbera vehicle broadside, plaintiff had to swerve to the left off the north side of the highway, where he traveled for a short distance; then he came back onto the highway and collided with the left side of the LaBarbera automobile. Both of these witnesses said the point of impact was about halfway between MacArthur Street and the driveway. Thus they placed the point of impact approximately 50 feet east of the driveway.
Counsel for defendant contends Mr. Vidrine testified plaintiff's truck was a block and a half from the LaBarbera car when he backed out of the driveway. It is true Vidrine's testimony under original direct and cross-examination could be so interpreted. However, when Mr. Vidrine was called back to the witness stand as a rebuttal witness, he explained that he intended to testify plaintiff's truck was a block and a half from MacArthur Street when he first saw it; and that the truck was only 40 to 60 feet from the driveway when Dr. LaBarbera backed out. Of course, it was within the province of the jury to believe or disbelieve Vidrine's testimony.
Plaintiff's testimony is also corroborated by Sgt. T. J. Andrus, of the Sulphur police force. He testified that when he arrived at the scene the two vehicles were about halfway between the driveway and MacArthur Street. Which means that Dr. LaBarbera had gone only about 50 feet east from the driveway to the point of impact, instead of 100 feet, as Dr. LaBarbera contends.
On the other hand, Dr. LaBarbera's testimony was corroborated by that of his wife, who was a passenger in his car. She testified that, as her husband backed slowly out of the driveway, she glanced to the west and saw the lights of plaintiff's truck approaching "quite a distance away"; and there was ample time for the doctor to back out, turn and drive to the east. She says the next thing she noticed was that plaintiff was apparently trying to pass them and then he struck their vehicle. She did not know where the point of impact was located.
Mrs. Walter Cade, also a passenger in Dr. LaBarbera's vehicle, observed very little and was unable to corroborate the doctor's version of the accident.
From the above brief resume, it is apparent there was sufficient testimony, if believed by the jury, to support plaintiff's version of the facts. It was within the province of the jury to evaluate the testimony of the witnesses. Certainly, we can find no manifest error in this evaluation.
There is no dispute as to the applicable law. LSA-R.S. 32:124 provides generally that a motorist backing out of a private driveway must stop at the sidewalk or curb and yield the right of way to any approaching vehicle which is so close as to constitute an immediate hazard. Our jurisprudence has established the general rule that an unusually high degree of care is required of a motorist who backs out of a private driveway onto a highway. See Josey v. Granite State Fire Insurance Company, *327 La.App., 122 So.2d 303, and the cases cited therein.
Applying these rules of law to the facts as found by the jury, it is clear that Dr. LaBarbera was negligent in backing out of a private driveway at a time when plaintiff was so close as to constitute an immediate hazard.
It is also clear that plaintiff was not guilty of any contributory negligence. The speed limit in this area, near the city limits, was stated by the witnesses to be either 40 or 45 MPH. Plaintiff testified he was going from 40 to 45 MPH and the age of his truck and the distance within which he stopped do not show this to be unreasonable. If, as the jury certainly could have found from the testimony of the witnesses, plaintiff was only 40 to 60 feet away when Dr. LaBarbera suddenly "shot out" directly across the highway in plaintiff's path, then plaintiff was not guilty of any negligence. He saw the LaBarbera car as soon as he should have and he did everything he could to avoid the accident, but was unable to do so.
In this court, counsel for the defendant argues the trial judge erred in his refusal to allow defendant to introduce into evidence a certified copy of a police report of the accident. This report is signed by Officer Dwight Landry and Captain Wilfred Abshire, as investigating officers. Actually, Officer T. J. Andrus, who appeared as a witness during the trial of this case, also signed as an investigating officer, but he said he did nothing more than direct traffic at the scene.
At the time of the trial, Captain Abshire was deceased; and Officer Landry was no longer employed by the police department and was out of the state. The defendant sought to introduce the report in evidence principally for the purpose of showing that the location of the accident was 96 feet east of the driveway. On objection by counsel for plaintiff that the report was hearsay, the court refused to allow it.
Defendant points out that the prior statutes, Act No. 21 of 1932, Section 14(n) and La. Revised Statutes of 1950, Title 32, Section 379, expressly forbade the introduction of these accident reports in evidence "for any purpose in any trial, civil or criminal, arising out of such accident." In 1962 this Act was repealed and replaced by LSA-R.S. 32:398, which makes no reference whatsoever to the admissibility or inadmissibility of these accident reports in evidence. Defendant argues that since the new act omits the provisions as to inadmissibility, it must be construed that the legislature intended these reports to now be admissible in evidence.
Furthermore, defendant argues these accident reports are admissible under the public records act, LSA-R.S. 13:3711, which reads as follows:
"Copies of any books, records, papers or other documents of any of the executive and administrative departments, boards, and agencies of this state, and copies of any books, records, papers, or other documents of any of the political corporations, bodies politic, boards, departments and agencies of this state and the parishes and municipalities thereof, when certified as being true copies by the official, officer or employee in whose custody they may be, shall be admitted in evidence in all courts of this state, equally with the originals of such books, records, papers or other documents."
Source: Acts 1942, No. 191, Section 1.
Defendant contends this duly certified copy should have been admitted in evidence under LSA-R.S. 13:3711 quoted above. But, we note that this statute contains the proviso that the copy shall be admitted "equally with the originals of such books, records, papers or other documents." We interpret this to mean that the copy, although certified, is not admissible unless the original would also be admissible if it were in court. If the original would be subject to objection under the general rules of *328 evidence, such as the hearsay rule, then this same objection would exclude the copy.
This is also made clear in LSA-C.C.P. Article 1394, which was adopted in 1962 and reads as follows:
"An official record, or an entry therein, of the State of Louisiana or of any political subdivision, corporation, or agency thereof, when admissible for any purpose, may be evidenced by copies certified as being true copies by the officer or employee having custody thereof."
In LSA-C.C.P. Article 1394 we note particularly the proviso "when admissible for any purpose". We interpret this to mean that a certified copy of the official record is admissible only if the official record itself would be admissible in evidence. If the original would be objectionable under the general rules of evidence, such as the hearsay rule, then likewise the copy would be objectionable.
With this understanding of the statutory law, we think the certified copy of the accident report in the present case is objectionable as hearsay. It is an out-of-court statement made by Officers Landry and Abshire, neither of whom is now in court, under oath, and available for cross-examination. This report, like many such reports, is particularly objectionable under the hearsay rule because it obviously contains conclusions and opinions of the officers formed from talking to other witnesses. This is hearsay compounded.
The final issue is whether the jury's award of $17,000 is excessive. This case is unique in that the principal basis for the jury's award is the aggravation of back injuries received by plaintiff in a work-connected accident in 1959. Hence, a history of this prior injury is required.
While working as a roughneck in 1959 plaintiff suffered a herniated disc at L-4. He was treated by his family physician, Dr. Victor D. Watson, who finally referred him to Oschner Clinic in New Orleans, where a laminectomy was performed in 1960. He had a "poor result" from surgery and continued under Dr. Watson's treatment consisting of medication for pain and muscle relaxation. Although the last time Dr. Watson saw him, before the automobile accident in question here, was April 11, 1962, he continued to authorize the druggist to provide the medication.
All during this time plaintiff received workmen's compensation payments. Dr. Watson was of the opinion that plaintiff progressively improved during 1962, 1963 and up to the time of the accident in question here in April of 1964, but was of the opinion plaintiff could never have returned to hard manual labor. Corroborating this diagnosis is the uncontradicted testimony of plaintiff and his sister and other laymen that he worked for a while in the business of junking cars and in the furniture business and tried to go to trade school.
On the night of the accident plaintiff was actually on his way to Crowley, Louisiana to try to obtain employment as a roughneck with a drilling concern. Whether he would have been able to obtain this employment, after questioning as to his past medical history, is conjectural. But the evidence does show that by the time of the accident in question here plaintiff's back had improved considerably, he could walk without difficulty and was even willing to try to go back to hard manual labor.
Immediately after the accident, on the night of April 4, 1964, plaintiff did not have any severe symptoms. He says his head, neck and back hurt, and he had a large bruise in the middle of his back. He returned to his home in Vinton that night and actually didn't go to see Dr. Watson until April 11, 1964. Dr. Watson diagnosed a whiplash injury and an aggravation of the old lumbar injury. He started treating plaintiff with additional drugs for pain and muscle relaxation.
The doctor explained that due to his previous injuries, and the ensuing long period of pain and disability, plaintiff was very *329 nervous and anxious about his physical condition and this aggravated the problem. The doctor said the muscles in plaintiff's back apparently would not strengthen after this accident and that he walked bent over from the waist or had to use crutches. Dr. Watson was of the opinion that at the time of the trial of this case in March of 1966, two years after the accident, plaintiff was still having pain in his neck and cervical region due to the whiplash injury; as well as pain from the aggravation of the lumbar injury. He expressed the opinion that, as a result of this accident, plaintiff was actually worse off than he was when he had the laminectomy in 1960 and that plaintiff is permanently and totally disabled and probably will have to walk on crutches the rest of his life. For instance, Dr. Watson summarized his testimony as follows:
"Q You say a hundred per cent aggravation, Doctor?
A I think the man is worse off than when he went down and had the operation. Yes sir. That's the reason I place my hundred per cent on it.
Q Doctor, is he in any condition today to carry himself without his crutches and do any type of reasonable gainful employment?
A Not unless he did it without the use of his back.
Q Or his legs?
A Or his legs. If he had a sitting job, possibly yes.
Q He does have the use of his arms?
A Yes, he has the use of his arms.
Q Does he have the use of his legs?
A No, notwith the aid of crutches he has use of his legs. He shuffles.
Q Doctor, do you feel like his present condition, total disability, is permanent?
A Yes, sir, I feel that it is permanent.
Q Have you tried to correct this through treatment and medication for the last two years?
A I have.
Q Have you had any success?
A No, sir."
Dr. Watson was the only expert medical witness to testify in this case. The defendant insurer put on no expert medical testimony whatever.
The lay witnesses, plaintiff's sister, Mrs. Ida Dobson, and a family friend, Mrs. Norma Hanagriff, corroborated the fact that since the accident in 1964 plaintiff has either walked bent over from the waist or had to use crutches.
Defendant argues that plaintiff's residuals, if any, at the time of trial are principally the result of the workmen's compensation accident in 1959, rather than the automobile accident in 1964. The record shows that in October of 1964, which was about five months after the automobile accident, the plaintiff made a workmen's compensation settlement of approximately $6,500, in which proceedings he alleged he was permanently and totally disabled as a result of the work-connected injury. As stated above in our discussion of the testimony of Dr. Watson, he was of the opinion that even before the 1964 accident plaintiff could never have returned to hard manual labor. On this basis the workmen's compensation settlement was justified. But, Dr. Watson also testified, as set forth above, that plaintiff had improved considerably by the time of the accident, and that now, as a result of the accident, plaintiff is much worse than he ever was.
Defendant also attempted to show that about one month after the accident in 1964, plaintiff had a first fight with a Mr. Kiser. We can only say the jury had the right to evaluate this testimony.
*330 Under all of the evidence, we find no abuse of the jury's discretion in awarding the sum of $17,000.
For the reasons assigned, the judgment appealed is affirmed. All costs of this appeal are assessed against the defendant appellant.
Affirmed.
HOOD, Judge (dissenting).
I am unable to agree with the conclusions reached by the majority that Dr. LaBarbera was negligent or that plaintiff was free from contributory negligence.
The physical facts clearly support the statements of Dr. LaBarbera, of his wife and of Mrs. Cade as to how the accident occurred, and I am convinced that it occurred exactly as described by them. The majority has brushed aside the testimony of these witnesses, however, and instead has accepted one of the two conflicting versions of the facts which were given by Mr. and Mrs. Burley J. Vidrine. There is a serious question as to whether Mr. and Mrs. Vidrine witnessed the accident at all. A city policeman arrived at the scene within two minutes after it occurred, and neither he nor anyone else saw the Vidrines in that vicinity.
When Mr. Vidrine was first called to the witness stand, he testified repeatedly, under intense direct and cross examination, that plaintiff's truck was at least a block and a half, or about 500 feet, from the LaBarbera car when the latter backed out of the driveway. The next day, however, Vidrine was called back to the stand by plaintiff and at that time he changed his testimony completely, stating that plaintiff's truck was only 40 to 60 feet from the LaBarbera car when it "shot out" of the driveway. His last version of how the accident occurred conflicts with his original testimony, with the statement of all of the occupants of the LaBarbera car, and with plaintiff's own version of what transpired. Also, Vidrine's last version of how the accident occurred cannot be reconciled with the physical facts. Yet, the majority has accepted Vidrine's last and completely revised account of the facts as being true on the ground that "it was within the premise of the jury to believe or disbelieve Vidrine's testimony." I think the majority erred seriously in doing so.
Even if we ignore all of the defendant's evidence, plaintiff's own testimony shows beyond any question that he was guilty of contributory negligence which bars him from recovery. Deville testified that immediately before the accident occurred he was watching the road ahead of him carefully, that there was nothing to obstruct his vision, that he saw the LaBarbera car as soon as it came within range of his headlights, and that when he first saw the car it was stopped or parked across the center of the highway. He stated repeatedly that he did not see the LaBarbera car back out of the drive way at all, but that when he first observed it the car was "dead still" across the center line of the highway. Some of plaintiff's testimony to that effect is:
A. I didn't see him back. As I stated before when he got in my lights he was immediately ahead of me. * * * (P. 140.)

* * * * * *
Q. Now did you see this car before it backed out in front of you?
A. No, sir, I didn't see it whenwhen I saw the car it was immediately ahead of me. (P. 94.)

* * * * * *
A. Well, it seemed like he had stopped there to make a decision to go * * *. (P. 95.)

* * * * * *
Q. You never saw Dr. LaBarbera's car either backing up or going forward, is that right?
A. To me it looked dead still with a bunch of children in it. (P. 152.)

*331 * * * * * *
Q. Why didn't you see it when it was backing up?
A. Well, I don't know, sir, why I didn't see it. When I caught it in my headlights I didn't have time to think of anything but avoiding the car. * * * (P. 152.)

* * * * * *
Q. Well, were you looking straight ahead?
A. I was looking down the highway, sir.
Q. Were you watching the road?
A. Very definitely.
Q. And what you are saying is that when your lights first got to where you could see that car it had already backed up so that the back of it was across the center line of traffic, is that right?
A. Yes, sir. (Pp. 152-153.)
Plaintiff concedes that the headlights of his truck were burning, that the lights of the LaBarbera car were on, and that when he first saw the car it was parked facing in a southeasterly direction. The taillights of the LaBarbera car, which admittedly were on at the time, were in full view of plaintiff as he approached. Yet plaintiff offers no explanation as to why he didn't see the car sooner, other than that he saw it as soon as it came within the range of his headlights. He has not explained why he did not see the burning taillights of the LaBarbera car even before the rest of the automobile came within range of his vision. If we assume that he did see the LaBarbera car as soon as he should have seen it, he has offered no explanation as to why he was not maintaining sufficient control over his truck as to permit him to stop within the range of his vision, or even to simply get into the passing lane of traffic and thus avoid a collision.
I also feel that the conclusions reached by the majority as to how the accident occurred cannot be reconciled with the physical facts. Plaintiff concedes that he was driving at least 40 miles per hour as he approached the scene of the accident. He testified that when he first observed the LaBarbera car "dead still" ahead of him, it was straddling the center line of the highway, with the rear bumper of the car being not more than three feet from the north shoulder. With that information, and considering the distance required to make the necessary turns, I think it is logical to assume that the car backed a minimum of about two car lengths, or at least 30 feet, before plaintiff first observed it. If we take into consideration the stopping distance which would be required, it is apparent that the driver could not have averaged more than five miles per hour while traveling that 30 feet, even if we assume that he "shot out" of the driveway, as stated by Vidrine. While the LaBarbera car was backing out that distance of 30 feet, plaintiff's truck, which was traveling eight times as fast, obviously traveled at least 240 feet. Also, plaintiff states that the LaBarbera car had already backed out and had come to a stop before he first saw it, and that he was 40 to 50 feet from the car at that time. This shows, therefore, that plaintiff's truck could not conceivably have been less than 280 or 290 feet from the LaBarbera car when the latter first began backing out of the driveway.
Further, the evidence shows that the LaBarbera car was traveling slowly from the point where he backed out of the driveway to the point of impact, which according to the evidence most favorable to plaintiff was a distance of about 50 feet. The car could not have attained much speed within that distance, and there are two other factors which show that it was traveling at a relatively slow speed. One is that it stopped at the point of impact, although its momentum would have carried it forward if it had been speeding; and the second is that the truck overtook and passed *332 the car as the latter was traveling the 50-foot distance. It is obvious, I think, that plaintiff's truck traveled much more than 50 feet while the automobile was being driven in an easterly direction, in its own east-bound lane of traffic, from the driveway to the point where it was struck by the truck. This shows that the truck was much more than 280 or 290 feet from the car when the latter began backing out of the driveway. I think the physical facts alone, therefore, show that the accident could not have happened as assumed by the majority.
Under our law, a motorist is held to have seen an object which, by the use of ordinary care and prudence, he should have seen in time to avoid running into it, and the driver of an automobile is guilty of negligence in driving at a rate of speed greater than that in which he could stop within the range of his vision. Geoghegan v. Greyhound Corp., 226 La. 405, 76 So.2d 412; Lewis v. Quebedeaux, 134 So.2d 93 (La.App., 3d Cir. 1961).
In my opinion, plaintiff must be held to have seen the LaBarbera car in time to have avoided running into it. I think the evidence clearly shows that plaintiff was negligent in failing to maintain a proper lookout, in failing to see the LaBarbera car as soon as he should have seen it and in driving his truck at such a speed that he was unable to stop within the range of his vision. I am convinced that the accident resulted solely and only from plaintiff's negligence. But in any event, Deville should be barred from recovery by his own contributory negligence.
For these reasons, I respectfully dissent.

On Application for Rehearing.
En Banc. Rehearing denied.
HOOD, J., is of the opinion that a rehearing should be granted.