401 So.2d 528 (1981)
Flint H. GARRISON, Individually and on Behalf of his Minor Children, Gary, Evelyn, Rita and Curtis Garrison; and Ursula Garrison, wife of Flint H. Garrison, Plaintiffs-Appellees
v.
STATE of Louisiana, Through the DEPARTMENT OF HIGHWAYS et al., Defendants-Appellants-Appellees.
No. 14573.
Court of Appeal of Louisiana, Second Circuit.
June 8, 1981.
Rehearing Denied July 15, 1981.
*530 Johnson, Johnson & Johnson by Don H. Johnson, Monroe, for defendant-appellant, State of Louisiana through the Department of Highways.
Thomas V. Gardner, Jr., Asst. City Atty., for defendant-appellee, City of Monroe.
Brown, Wicker, Lee & Barnes by Robert A. Lee, Monroe, for plaintiffs-appellees.
Before HALL, JASPER E. JONES and FRED W. JONES, Jr., JJ.
En Banc. Rehearing Denied July 15, 1981.
FRED W. JONES, Jr., Judge.
This is one of three suits, arising out of the same accident, consolidated for trial purposes. Our reasons for judgment in all three suits will be set forth herein. However, a separate judgment will be rendered in each of the other consolidated suits.
After trial of the consolidated suits for damages arising out of an intersectional collision between two vehicles, the district judge found that the sole legal cause of the accident was the negligence of the State Department of Highways which had responsibility for the maintenance of a malfunctioning traffic light. The State appealed these judgments, contending that (1) the accident was caused by the negligence of one of the involved drivers; (2) the City of Monroe, another defendant, had responsibility for maintaining the particular malfunctioning traffic light and also for safeguarding *531 the intersection when the signal was malfunctioning; and (3) the damages awarded were excessive.
The accident occurred on Sunday morning, March 7, 1976, at about 9:00 o'clock at the intersection of U.S. Highway 80 (a multilane highway running generally east and west) and U.S. Highway 165 by-pass (a multilane thoroughfare running generally north and south) in Monroe. Traffic at the intersection was controlled by semaphore signals facing drivers in their respective lanes, with five separate fixtures positioned at points over the intersection.
Just prior to the accident Sue Combs, accompanied by her small daughter, was approaching the intersection from the south, driving north on Highway 165 by-pass. At the same time Ursula Garrison, with four of her children as passengers, was nearing the intersection from the east, driving west on Highway 80. Mrs. Combs testified that, since the light on the traffic signal facing her was green, she proceeded into the intersection and had crossed three of the four traffic lanes when her car was struck on the right side by the front of the Garrison automobile. On the other hand, Mrs. Garrison claimed that she was also facing a green light on the signal governing her right outside traffic lane as she entered the intersection.
As a result of this accident, suits for damages were filed on behalf of the owners and occupants of the Combs vehicle and the Garrison automobile against the State of Louisiana, through the Department of Highways ("State") and the City of Monroe ("City"), alleging that the accident was caused by a malfunctioning traffic light for which both defendants were responsible. State Farm Mutual Automobile Insurance Company, as subrogee for property and medical payments to the Garrisons, sued the State, the City, Sue Combs and her insurer, Heritage Insurance Company of America. The State and the City third-partied each other, contending that the other defendant was responsible for maintaining the traffic signal which was allegedly malfunctioning.
The trial judge made the factual finding that both Mrs. Combs and Mrs. Garrison faced green lights as they entered the intersection; that the traffic signal facing Mrs. Combs was malfunctioning; and that the State had sole responsibility for maintaining this traffic signal and was liable for its malfunctioning.
The issues raised on this appeal will now be discussed separately.
Legal Cause of the Accident
The State concedes that the traffic signal facing Mrs. Combs was malfunctioning but argues that the defect consisted of displaying red and green lights simultaneously; that Mrs. Combs was negligent in proceeding into the intersection when confronting this configuration; and that her negligence was the cause-in-fact of the accident. Cited in support of this position is American Road Ins. Co. v. Montgomery, 354 So.2d 656 (La. App. 1st Cir. 1977) which held a driver negligent for entering an intersection when faced by both a green and a red light.
Our examination of the record leads us to the conclusion that either the traffic signal facing Mrs. Combs or that facing Mrs. Garrison, or both, could have been malfunctioning at the time of the accident.
With respect to the signal on Highway 80 facing Mrs. Garrison's traffic lane: Just after the accident, Wallace Bostelmann said he was driving west on Highway 80, approaching the intersection from the east, when he noticed that the signal facing him appeared to be functioning in an erratic manner. After the accident Thomas Boyte, Monroe police officer, directed westbound traffic on Highway 80 at the intersection. He noted that, for a sustained period of time, the signal facing this traffic displayed a green and red light simultaneously. Robert Bynum, an electrician for the State Department of Highways, testified that, in response to a complaint, he checked the signal in question on Thursday, March 4, 1976, and found a loose wire in the disconnect hanger which caused the light to blink on and off when the wind was blowing. Bynum stated that he corrected this defect.
*532 With respect to the signal on Highway 165 by-pass facing Mrs. Combs' traffic lane: Bostelmann testified that he stopped at the accident scene for 15 or 20 minutes and then went around to observe the signal facing northbound traffic on Highway 165 by-pass. He noted that the light was changing sporadically, at times going rapidly from red to green and from green to red without displaying the amber caution light. He never saw the green and red lights displayed simultaneously.
Charles Pitarro stated that he was driving west on Highway 80 between 8 and 8:30 o'clock on the morning of the accident. Faced with a green light, Pitarro started to enter the intersection when a car coming from his left, traveling north on Highway 165 by-pass, drove across the street in front of him as though that vehicle also faced a green light.
Officer Boyte testified that on Saturday, the day before the accident, he observed the signal at the intersection facing northbound traffic on Highway 165 by-pass displaying the green light in an erratic manner. This was reported to the Monroe Police Department radio center.
Richard Baker, a mechanical engineer, stated that on the Friday prior to the accident he was driving north on Highway 165 by-pass and noticed that the traffic signal facing him before entering the intersection appeared to be malfunctioning, since it was changing rapidly from green to red without displaying the amber caution light.
John Cheek, who was working at that time as an electrician for the State Highway Department, testified that he "pulled maintenance" on the control box (which regulated and operated all traffic signals) at this intersection on Thursday, March 4, 1976. Cheek replaced contacts which were burned and also replaced a chipped cam which controlled the green arrow that permitted traffic traveling west on Highway 80 to turn south on Highway 165. Cheek returned the next day, in response to a message that someone had reported a traffic signal malfunction at this intersection, but detected nothing amiss with the lights.
Cheek was also contacted about the malfunction at the time of the accident and visited the scene early that Sunday afternoon. He watched the signals operate for about an hour but saw no apparent malfunction. Then he noticed that the center light facing northbound traffic on Highway 165 by-pass started performing erratically, showing a red display and then a simultaneous green display for about three seconds. Opening the control box, Cheek discovered that lobe # 3 of the cam which controlled the functioning of this particular signal was broken. With replacement of this cam the malfunction appeared to be corrected.
Malcolm Matthews stated that he was traveling in the right lane of Highway 165 by-pass on the morning of the accident and had stopped at the intersection when faced with a red light, preparing to turn right onto Highway 80. He noticed a car pass on his left and enter the intersection, where it collided with another vehicle. Matthews acknowledged that he did not know the color of the light facing Mrs. Combs (driver of the car passing on his left) as she entered the intersection.
The State argues that, although Mrs. Combs was faced with a malfunctioning traffic signal, the lights displayed were simultaneously green and red. Consequently, she should have recognized that this signal was not functioning properly and was negligent for proceeding into the intersection under the circumstances.
Obviously the evidence was conflicting on this factual issue. Matthews witnessed no malfunction of the traffic signal facing him. Cheek described the malfunction upon which the State based its argument. On the other hand, Bostelmann observed the erratic movement between red and green which had been seen on previous days by Officer Boyte and Baker.
After carefully examining the record we cannot state that the trial judge was clearly wrong in his fact finding that both Mrs. Combs and Mrs. Garrison faced green lights as they entered the intersection just before their collision. Further, the State *533 did not prove that either driver, faced with a green light and having no warning of the malfunctioning traffic signal, was negligent by virtue of failing to maintain a general observation of the controlled intersection. See Gaspard v. Stutes, 380 So.2d 201 (La. App. 3rd Cir. 1980); Champagne v. McDonald, 355 So.2d 1335 (La.App. 3rd Cir. 1978).
Since both parties faced a green light, the signal or signals were obviously malfunctioning. Regardless of the mechanical or electrical defect or failure which caused this malfunction (a substantial portion of the record is consumed by speculation on this question), we agree with the trial judge that the sole legal cause of the accident was the malfunctioning traffic signal or signals.
Liability for the Malfunctioning Traffic Signal or Signals
The record shows that the traffic signals and control equipment at this intersection of two state highways, installed in 1969, was the property of the State. There is no question but that on the date of this accident the State was primarily responsible to the public for the proper maintenance of these traffic signals.
A governmental authority that undertakes to control traffic at an intersection has a duty to the motoring public to exercise a high degree of care in maintaining the devices installed for traffic control. Lochbaum v. Bowman, 353 So.2d 379 (La. App. 4th Cir. 1977).
According to a log maintained by the State in Baton Rouge, the maintenance work performed on the traffic signals at this intersection on Thursday, March 4, 1976 was the first since 1972. One or more of the signals again malfunctioned on the following Saturday and Sunday, the day of the accident. The precise nature of the malfunction that caused green lights to face both Mrs. Combs and Mrs. Garrison was not determined. It seemed to be corrected by the work performed on Sunday after the accident. Be that as it may, we agree with the apparent conclusion of the trial judge that the State had notice of a malfunction of some nature in the signals at this intersection on Thursday and that there was a continuing malfunction on Sunday which caused this accident. Therefore, the trial judge correctly held that the State was negligent in failing to properly maintain these traffic signals and to correct the malfunction after receiving adequate notice.
However, assuming that the State had no prior notice of the malfunction which was present on the day of the accident, we find that the State was strictly liable for this malfunction under La. Civil Code Art. 2317 and the rationale of Jones v. City of Baton Rouge, 388 So.2d 737 (La. 1980) and Shipp v. City of Alexandria, 395 So.2d 727 (La.1981). As pointed out in the latter case:
"An injured party seeking damages under art. 2317 need not prove negligence, that is, that any particular act or omission on the part of the defendant caused his injuries. He must only prove that the thing which caused the damage was in the care or custody of the defendant, that the thing had a vice or defect, that is, that it occasioned an unreasonable risk of injury to another, and that his injury was caused by the defect. Once these elements are proven, the custodian can escape liability only by showing that the harm was caused by the fault of the victim, by the fault of a third person, or by an irresistible force."
Here the traffic signals were in the custody of the State. At least one of the signals was malfunctioning. This malfunction caused an unreasonable risk of injury to the motoring public who entered this intersection in the sense that it constituted a "trap". The injuries sustained in this accident were caused by the described malfunction. The State did not prove that the accident was caused by the fault of the victims, by the fault of a third person, or by an irresistible force. Therefore, the State was strictly liable for the accident and resulting injuries even if it had not been guilty of negligence under La.C.C. Art. 2315.
*534 Whether the City is also liable for the accident under the circumstances of this case, as contended by the State, presents a more troublesome question.
The State argues, first, that if it is liable for damages sustained by the claimants in these cases, it should have judgment on its third party demand against the City under the terms of a maintenance contract executed by those two public bodies.
According to the record, the State and the City entered into a standard maintenance contract, effective for one year beginning July 1, 1975, renewed thereafter on an annual basis, covering designated state highways in Monroe. This contract provided in part that "the municipality shall ... maintain and operate traffic signals ..." Included among the specified signals were those at the intersection in question. Under the contract the City agreed to hold the State harmless from any damage claims arising out of the City's negligent failure to properly maintain the property covered by the agreement.
Since the contract did not state with specificity precisely what the City was to do in "maintaining" traffic signals, testimony was adduced at the trial pertaining to the understanding of the parties on this point and the actual practice of the parties under this phase of the maintenance agreement. The following colloquy occurred between the City Attorney and Ronald McNeely, Assistant District Engineer for the State Highway Department in the Monroe area, relating to the State's understanding of the City's duties under the contract:
"Q. Are you awareokay. Are you aware of any verbal agreement between the State Highway Department and the City of Monroe that is not expressly written out in the body of the contract?
A. There is a mutual agreement. I am not aware of the exact verbal exchange or where this came about but there is a mutual agreement.
Q. A mutual agreement. What is the mutual agreement in reference to? What does it have reference to?
A. Basically that the City of Monroe will provide electricity for the signals.
Q. Okay. That is one.
A. Will replace bulbs, fuses.
Q. Okay.
A. And do whatever other maintenance that they feel like they can do.
Q. You refer to it as minor maintenance on the lights?
A. Normally it is, yes, sir."
La. Civil Code Art. 1956 provides:
"When the intent of the parties is doubtful, the construction put upon it (the contract), by the manner in which it has been executed by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation."
The court in Robertson v. Handy, 354 So.2d 626 (La.App. 1st Cir. 1977) was faced with the problem of determining whether, under a similar maintenance agreement, the State or the City was liable for maintaining the shoulders of a state highway covered by the contract. In resolving this issue, it was pointed out:
"... (t)he evidence in the case makes it clear that both the State and the City understood the maintenance contract to require the City to maintain the shoulders.... Although the contract may be susceptible of the interpretation urged by the City herein, the conduct of both parties during the existence of the contract makes it clear that they intended that the shoulders be maintained by the City."
In these cases it was shown that both the State and the City understood the City's responsibility under the maintenance agreement with reference to traffic signals was limited to the performing of minor repairs, such as replacing bulbs and fuses. Since this was not the nature of the malfunction which occurred on the day of the accident, the City is not liable under the contract for the damages sustained by these claimants.
*535 The State argues, in the alternative, that the City is solidarily liable with it for damages because City employees failed to safeguard the intersection after receiving notice of the malfunction. The record does not support this position. The City dispatch officer testified that he received a report between 8:30 and 9:00 o'clock on the morning of the accident of a traffic signal malfunction at this intersection. An officer was immediately sent to the location but apparently did not arrive before the accident. The dispatcher also promptly notified Van Westbrook, a State employee, of the reported malfunction. Within two minutes after this telephone call the dispatcher received notice of the accident. In his deposition testimony Westbrook corroborated the testimony of the City dispatcher. Therefore, it was not proven that the City was negligent in this respect as charged by the State.
For these reasons, we find that the trial judge correctly absolved the City of liability in these cases.
Quantum
The State argues that the awards made by the trial judge for personal injuries sustained by the parties involved in the intersectional collision were excessive.
Only after making the finding that the record supports that the lower court abused its wide discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
Discussing appellate review of general damage awards, the court in Reck v. Stevens, 373 So.2d 498 (La.1979) stated:
"... (t)he initial inquiry must always be directed at whether the trier court's award for the particular injuries and their effects upon this particular injured person is, a clear abuse of the trier of fact's `much discretion,' La.Civ.C. art. 1934(3) in the award of damages. It is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reason, be considered either excessive ... or insufficient ... Only after such determination of abuse has been reached, is a resort to prior awards appropriate under Coco for purposes of then determining what would be an appropriate award for the present case."
With these guidelines in mind, we now consider the nature of the injuries sustained by the individuals involved in the intersectional collision. Unfortunately, our task is complicated by the paucity of medical evidence in the record pertaining to the claimed injuries.

Curtis Garrison
This youngster, six years of age at the time of the accident, suffered a fractured jaw and a severe facial laceration. The jaw injury required extensive oral surgery, entailing hospitalization for a week. The large cut across his face left a permanent, disfiguring scar. A clinical psychologist who examined Curtis stated that the child was developing a faulty self image because of his scar and that his neurotic condition (manifested by bedwetting) would probably become worse in the future.
In light of these circumstances, we do not find that the trial judge abused his broad discretion in his general damage award of $40,000 for Curtis' injuries.

Rita Garrison
This young lady, who was 14 years of age at the time of the accident, sustained bruises on both legs below the knees, with superficial scarring. She also had two chipped front teeth which apparently required no dental repair work.
In view of the relatively minor nature of these injuries, entailing minimal pain and discomfort, we find that in awarding the sum of $10,000 the trial judge abused his broad discretion.
Awards in reported cases for similar knee injuries have ranged from $200 to $2,000. Procell v. Sentry Insurance Co., 320 So.2d *536 345 (La.App. 2d Cir. 1975); Hay v. Sears, Roebuck & Co., 224 So.2d 496 (La.App. 3rd Cir. 1969). Similarly damaged teeth have been the basis of awards of between $1500 and $2500. Andrepont v. Naquin, 345 So.2d 1216 (La.App. 1st Cir. 1977); Munson v. Kendall, 290 So.2d 787 (La.App. 1st Cir. 1974); Loyacano v. Continental Ins. Co., 283 So.2d 302 (La.App. 4th Cir. 1973); Runfalo v. Meynard, 242 So.2d 599 (La.App. 4th Cir. 1970).
We conclude that the maximum award that the trial judge could have made for these injuries without abusing his discretion was $4,000.00 and, consequently, reduce this award from $10,000 to $4,000.

Evelyn Garrison
This young lady, 16 years of age at the time of the accident, suffered a cut on the forehead, which left a small permanent scar, and superficial bruises on her legs. She conceded that the facial scar could be concealed by the use of cosmetics. A plastic surgeon testified that the scar could be removed by surgical procedure at an estimated cost of $875.
Since these injuries were not of a serious nature and resulted in little pain and discomfort, we conclude that the trial judge abused his discretion in making an award of $10,000 in general damages.
Cases dealing with bruises of this nature have been previously reviewed. Typical of the reported cases assessing damages for facial scars of this description is Lynch v. Derryberry, 339 So.2d 507 (La.App. 2d Cir. 1976) in which an award of $5,000 was reduced to $1,500 for one claimant and $2,000 for another.
With reference to these injuries, we find that in the exercise of his discretion the trial judge could have awarded a maximum amount of $6,000, and reduce the award of $10,000 to $6,000.

Gerald (Gary) Garrison
This 17 year old son of Mrs. Garrison received a whiplash injury to the neck and also suffered a minor strain of the dorsal spine. He was confined to bed for two weeks and experienced pain and discomfort as a result of his neck injury, which required him to wear a neck brace, for about four months. He went to work as a carpenter some three months after the accident. At the time of the trial he was working offshore in the oil industry.
The record shows that this young man's primary complaint was with his neck injury, characterized by symptoms that indicated a moderately severe whiplash injury to the cervical region, but attended by no permanent residuals.
After considering the fact that no hospitalization was required for treatment of this injury and that there was no evidence of permanent disability, with the victim resuming manual labor after a relatively brief period of recuperation, we conclude that the trial judge abused his discretion in awarding $20,000 for this injury.
Of course, the reported cases involving awards for whiplash injuries to the neck are legion. Our review of those cases indicates that the damage awards for moderately severe whiplash injuries have ranged from $4,500 to $10,000. See Stoltz v. Continental Insurance Co., 231 So.2d 443 (La.App. 4th Cir. 1970); Ayres v. Great American Insurance Co., 163 So.2d 866 (La.App. 2d Cir. 1964).
In this case we have determined that the trial judge could have made a maximum award of $12,000 without abusing his discretion. Therefore, this award is reduced from $20,000 to $12,000.

Ursula Garrison
The 37 year old Mrs. Garrison sustained a knee injury which an orthopedic surgeon diagnosed as a pinched or possibly torn medial meniscus. She also had a cut on the forehead, near the hairline, which required ten stitches. This left no visible scarring. Although Mrs. Garrison resumed work a few weeks following the accident, she still complained of pain and discomfort at the time of the trial.
*537 In view of the limited time during which Mrs. Garrison was incapacitated by her injury and the admittedly speculative nature of the physical basis for her complaint, we find that the trial judge abused his discretion in awarding $20,000 in general damages for this injury.
In Phillips v. Williams, 323 So.2d 808 (La. App. 4th Cir. 1975) the plaintiff was awarded $4,500 for an identical knee injury. It was established in Billedeaux v. Adams, 355 So.2d 1345 (La.App. 3rd Cir. 1978) that the claimant had sustained a tear of the medial meniscus, for which $7,500 was awarded.
We have previously discussed awards for minor facial scars.
It is our conclusion that the maximum award which the trial judge could have made here without abusing his discretion was $12,500. Accordingly, we reduce this award from $20,000 to $12,500.

Sue Combs and Cammie Combs
Mrs. Combs suffered a cervical strain, accompanied by muscle spasms, for which she received treatment from March 8 until April 5. She missed some two weeks of work. The trial judge awarded her $4,000 in general damages. Mrs. Combs' small child, Cammie, received a contusion on the forehead, for which she was awarded $750. We do not find that these awards constituted abuses by the trial judge of his wide discretion.
Conclusion
For the reasons set forth, the judgment of the trial court is amended and that portion awarding damages is recast to read as follows:

"I
In favor of Flint H. Garrison as Administrator of the estate of his minor children as follows: For Gary Garrison, $12,000; for Evelyn Garrison, $6,000; for Rita Garrison, $4,000; and for Curtis Garrison, $40,000.

"II
In favor of Ursula Garrison, wife of Flint H. Garrison, $12,500.
As amended, the judgment is affirmed, with costs of this appeal assessed one-half to appellant and one-half to appellees.