442 So.2d 1180 (1983)
Dottie ROSS
v.
Joseph P. NOBLE, et al.
Joseph NOBLE, et al.
v.
The LOUISIANA DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, et al.
Nos. 83 CA 0203, 83 CA 0222.
Court of Appeal of Louisiana, First Circuit.
November 22, 1983.
*1182 Tim Tullos, Paul H. Due, Baton Rouge, for plaintiffs/appellees Joseph Noble and State Farm Mut. Auto. Ins. Co.
C. Alvin Tyler & Associates, Baton Rouge, for defendant/appellee John C. Wood.
Robert L. Oliver and Phillip Jones, Baton Rouge, and Randall J. Cashio, Baton Rouge, for defendant/appellant La. Dept. of Transp.
Before SHORTESS, LANIER and CRAIN, JJ.
SHORTESS, Judge.
These consolidated suits arose out of a motor vehicle accident which occurred on February 2, 1980, involving a vehicle operated by Katherine M. Wood and owned by John C. Wood, her father. Dottie P. Ross was a passenger in the Wood car. The other vehicle involved in the accident was owned and operated by Joseph W. Noble. The accident occurred at the intersection of Louisiana Highway 16 and Louisiana Highway 64 in Livingston Parish. A traffic semaphore signal controls traffic at this intersection, and the State of Louisiana, through the Department of Transportation and Development (DOTD), was made a defendant in both suits. Cross claims and third party demands between the parties and their insurers are involved.
After trial on the merits, the trial court found that the sole legal cause of the collision between Wood and Noble was the defective condition of the traffic semaphore signal at the intersection which it found to be unreasonably dangerous. It imposed liability against DOTD in accordance with La.C.C. art. 2317 and awarded judgment in favor of Ross for $93,485.26. It dismissed Ross' suit against Noble, finding no actionable negligence on Noble's part. It dismissed all third party demands. Additionally, it awarded State Farm Mutual Automobile Insurance Company and Noble damages of $3,986.37 and $100.00, respectively, representing the property damage to Noble's vehicle. DOTD was taxed with costs.
DOTD has appealed from both judgments and enumerates four issues.
(1) What was the cause in fact of the accident?
(2) Does the failure to produce evidence of post-accident repairs require the imposition of an adverse presumption of fault?
(3) Is an accident report admissible as primary evidence?
(4) Was the quantum awarded for damages excessive?
ISSUE ONECAUSE IN FACT
Wood testified that she approached the intersection of La. 16 and La. 64 from a southerly direction at approximately 40 to 45 miles per hour; that she had a green light as she approached; that as she entered the intersection the light turned blank; that she applied her brakes gently and continued on; that Noble's car entered the intersection from her right; that there was no way she could avoid it; that she slammed on her brakes and turned to her left but collided with the left side of Noble's vehicle, hitting its left back door; that after the accident she watched the light and it would correctly cycle for a few times and then would malfunction as the signal went from green to blank to red. On cross examination she estimated that she was about 30 feet from the intersection when the light blanked and was going 40 miles per hourno faster than 45 miles per hour; that she was fifteen years old at the time of the accident and had been driving about two or three months.
Wood's testimony was generally corroborated by her mother, Dottie Ross (plaintiff), who was a passenger in the front seat of the vehicle. Ross felt that there was nothing her daughter could do to avoid the accident because the light was green as they approached and then went blank when they were about 25 feet from the intersection.
David Ross, plaintiff's husband and Wood's stepfather, was called to the scene after the accident. He observed the light *1183 and found that occasionally when the light went blank on the south side, the green light came on on the east side.
Noble testified that he was proceeding east on La. 64; that he had stopped for a red light; that when the light changed to green he waited three or four seconds because there was a pickup truck opposing him with its left turn blinker on; that when he ascertained that the truck would not turn left in front of him, he pulled into the intersection; that he did not look to his left before pulling out because his attention was focused on the pickup truck; that he did not see Ross approaching; that he did not observe a malfunctioning light from his direction; that he also saw a car to his right which stopped as the light changed to green for him; that as he pulled forward into the intersection his vehicle was struck on the left side at the rear passenger door.
Donald DeVall testified that he was facing Noble in a pickup truck with his left blinker on; that he had stopped for the red light and was sitting there admiring Noble's nice new car; that he had his left-turn blinker on when the light turned green but waited for Noble; that Noble "kinda set there" but so did he and finally Noble came across the intersection; that prior to that he had seen nothing coming from his right; that he saw the car that hit Noble just seconds before the collision; that three or four seconds passed before Noble proceeded into the intersection; that he did not move forward prior to the accident; and that he did not observe the light malfunction but was not watching for a malfunction.
Cecile Holley was proceeding north on La. 16. She testified that as she approached the light it went from green to yellow; that she slowed down and stopped as the light turned red; that she sat there two or three seconds and then Noble pulled from her left side into the intersection; that Noble was just under the red light when struck; that after she stopped she noticed the oncoming car which looked like it was trying to slow down; that the car was coming too fast to stop if it had the red light and she felt that an accident was inevitable.
The trial court had testimony from all four of the drivers who were at the intersection, all of whom were proceeding in different directions. That testimony indicated that northbound traffic had a red light, eastbound and westbound traffic had a green light, and southbound traffic had a blank light.
After the accident, the Louisiana State Police was called and Trooper Jean Claude Crescionne arrived on the scene at approximately 3:59 p.m. to investigate. He interviewed witnesses and prepared an accident report. Unfortunately, Crescionne died before the trial. The trial court permitted in evidence over strenuous objection from DOTD a certified copy of his report. The thrust of its objection was that the report was hearsay and should not have been admitted because the well-settled law of Louisiana is that when a person making an accident report is unavailable for cross-examination, the report is inadmissible as hearsay. Southern County Mutual Insurance Company v. Bryant, 385 So.2d 1286 (La.App. 3rd Cir.1980); Robinson v. St. Paul Fire & Marine Insurance Co., 298 So.2d 282 (La.App. 1st Cir.1974), writ denied, 302 So.2d 23 (La.1974); Veal v. Hutchinson, 284 So.2d 60 (La.App. 4th Cir. 1973); writ denied, 286 So.2d 662 (La. 1973); Montgomery v. City of New Orleans, 266 So.2d 482 (La.App. 4th Cir.1972), writ denied, 263 La. 370, 268 So.2d 258 (1972); Deville v. Aetna Insurance Company, 191 So.2d 324 (La.App. 3rd Cir.1966), writ denied, 250 La. 13, 193 So.2d 527 (1967).
We agree that the well-settled law of this State is that accident reports are inadmissible primarily because of the hearsay contained therein. There are other objectionable grounds such as improper opinions or conclusions. In this case, Ross seeks to circumvent the hearsay objection by arguing that since Crescionne was employed by the State and the State is a party defendant, that any reports he made would be admissible as an "admission against interest." *1184 He cites Pennington v. F.G. Sullivan, Jr., Etc., 416 So.2d 192 (La.App. 1st Cir.1982), writ denied, 421 So.2d 248 (La. 1982); and Campbell v. American Home Assurance Company, 260 La. 1047, 258 So.2d 81 (1972). In Pennington, a conversation with defendant's employee was deemed to be admissible as a statement of an agent acting for a principal. Campbell dealt with a letter wherein a vehicle owner stated he had no insurance. That statement was determined to be a declaration against interest and admissible. The authority cited by Ross is inapposite to the facts presented here. Furthermore, we cannot tell from the accident report whether Crescionne's notations were his own perceptions or were related to him by others. If related by others, then clearly, the accident report would contain double hearsay declarations. In the pertinent portion of the report, the trooper made the following notation:
Veh. 2 was stopped for red light and Veh. 1 was southbound on green light. The green light went out and showed nothing, the red light turned green. Veh. 1 struck Veh. 2 at right angle. Light was watched for long period of time and continued to do the same. Light went from green to nothing to red. This occured (sic) every five light stages.
Crescionne was not present when the accident happened, so anything he related concerning positions of vehicles and how the accident happened was related to him by others. His notation relative to the light itself might be his perception but could be that of someone else. The trial court erred in permitting the accident report into evidence because it was hearsay. That court noted, however, that it placed little weight on the report. We find that any error created by the admission was harmless.
DOTD called two witnesses. Sherwood Lanier had been in the signal maintenance department for twenty years. He testified generally about how the lights were supposed to operate. Robert Adams was district traffic operations engineer. He testified that if the light blanked on the amber cycle for southbound traffic, it should have blanked for northbound traffic also. He also testified that had Wood been faced with a blank it should have been for no longer than three seconds, the length of the amber cycle.
Without objection, Adams also testified that the State Police called the night of the accident to report the malfunctioning light at this intersection, but he had no record of what was done to repair it.
All four drivers spoke of a short threeor four-second interval before Noble's movement as Wood proceeded into the intersection. If the light did malfunction, then Wood was confronted with a sudden emergency not of her own making, especially if the green light had come on for westbound traffic while her light was blank, as testified to by plaintiff and Wood. Their testimony is corroborated by Adams' admission that DOTD received notification from the State Police the night of the accident that the light was malfunctioning.
As a matter of law, a high degree of care must be exacted of those whose obligation it is to maintain traffic signals. The greater degree of volume of traffic, the greater is the need for effective vehicular control, which includes properly functioning signals upon which motorists may rely with confidence. Chesson v. American Hardware Mutual Insurance Company, 412 So.2d 186 (La.App. 3rd Cir.1982); McDaniel v. Welsh, 234 So.2d 833 (La.App. 1st Cir.1970), writ denied, 256 La. 616, 237 So.2d 397 (1970).
Strict liability under La.C.C. art. 2317 is likewise applicable with respect to defective things, such as malfunctioning traffic lights, within the custody or under the control of public bodies. Jones v. City of Baton Rouge, Etc., 388 So.2d 737 (La. 1980); Garrison v. State, Through Dept. of Highways, 401 So.2d 528 (La.App. 2nd Cir.1981).
Considering the entire record, we cannot say that the trial court was clearly wrong in finding that the sole legal cause *1185 in fact of the accident was the malfunctioning traffic light under the control of DOTD. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
ISSUE TWOPOST-ACCIDENT REPAIRS AND ADVERSE PRESUMPTION
It is unnecessary to address this issue because of our treatment of Issue One.
ISSUE THREEADMISSIBILITY OF THE ACCIDENT REPORT
We disposed of this issue while discussing Issue One.
ISSUE FOURWAS QUANTUM EXCESSIVE?
The total award to Ross was $93,485.26. DOTD argues that $75,000.00 in general damages, $5,000.00 for future medical expenses and $5,000.00 for future loss of wages was excessive since the evidence showed that Ross suffered only a chronic cervical strain.
The medical portion of the case was presented by depositions and reports. The trial court found that Ross sustained injuries resulting in a probable herniated cervical discs at two cervical interspaces which will in all likelihood require surgery.
Within two weeks of the accident, Ross was seen by Dr. J. Louis Tonore with left shoulder pain complaints. He found cervical spasm through February. On March 2, 1980, Dr. William F. Hageman, an orthopedic surgeon, hospitalized plaintiff after receiving complaints of pain in the left side of her neck, posteriorly, and headaches over the occiput. He found mild spasm and straightening of the cervical lordosis and kept her hospitalized in traction for one week. Plaintiff went to Ochsner Clinic on May 14, 1980, because of her continued complaints. She was diagnosed as having a cervical sprain by Dr. Ed Connelly, a neurosurgeon at Ochsner. On May 11, 1981, Ross saw Dr. Kenneth Adatto, an orthopedic surgeon in New Orleans, who diagnosed a chronic cervical syndrome. Dr. Adatto saw her periodically and treated her with medication. After a sophisticated fourth generation CAT scan became available in New Orleans, Adatto suggested a cervical CAT scan to Ross. On July 2, 1982, she had the testing done by the Prytania Computerized Radiology Group, Inc. The test results given to Adatto were:
There is a soft tissue density projecting posteriorly and slightly to the left at the level of the C4-5 disc space. This may be related to local disc pathology. This is not a definite abnormality.
The central canal is normal at all levels. There is very mild narrowing of the left sided foramen at C5-6. The other foramina are normal.
Based on those findings, along with his own observations and treatment, Adatto was 90% sure that Ross had ruptured discs at two cervical levels. This evidence was uncontroverted. The trial court's award of $75,000.00 in general damages was not clearly erroneous. Its award was not an abuse of discretion. Reck v. Stevens, 373 So.2d 498 (La.1979).
The trial court awarded $5,000.00 for future loss of earnings. The record showed that Ross worked as a substitute teacher for the Livingston Parish School Board. In 1979 she worked 42 days at $20.00 per day. In 1980, the year of the accident, she did not work at all. In 1981, she worked three days in December. She had not worked in 1982 through September 10, the date of trial. Plaintiff testified that she had not worked because of pain. The trial judge, using a 42-day period as his benchmark, awarded $2,280.00 for loss of income.
Dr. Adatto felt that plaintiff should have surgery. Plaintiff testified she would submit to the surgery Adatto suggested. The hospital stay was estimated to be four to five days. No evidence was produced as to the prognosis, and no medical estimate was given as to the maximum recovery period. Pisciotta v. Allstate Ins. Co., 385 So.2d 1176 (La.1979). Plaintiff failed to prove a $5,000.00 diminution of earning capacity. The daily rate for a non-degreed substitute teacher such as plaintiff was $30.00 per day at the time of trial. The trial court was clearly wrong in awarding what amounted to 166.67 days (approximately four years at 42 days per year at $30 per day) of lost future income. Fifty days at $30.00 per day, or $1,500.00, is all *1186 the record can support, and we must reduce this award to conform therewith.
Appellant also complains about the $5,000.00 award for future medical expenses. It was inadequate, but appellee has not answered this appeal. Adatto testified that the hospital expenses for the operation would cost $10,000.00, and his bill would be $5,000.00. We cannot change this award since adequacy is the only issue before us.
CONCLUSION
The trial judge was not clearly wrong in his findings on liability. His award of general damages was not an abuse of discretion. His award of future loss of income is reduced to $1,500.00. His award of future loss of income is reduced to $1,500.00. His award of future medical expenses is affirmed. Judgment in 83CA0222 is affirmed. Judgment in 83CA0203 is reduced to $89,985.26, together with legal interest thereon from date of judicial demand until paid. DOTD is taxed with costs, which amount to $1,346.59.
AMENDED AND AFFIRMED.