439 So.2d 1132 (1983)
Raynell ROLLINGS
v.
WINN DIXIE LOUISIANA, INC.
No. CA-0730.
Court of Appeal of Louisiana, Fourth Circuit.
October 6, 1983.
Rehearing Denied November 22, 1983.
*1133 Dan R. Dorsey, River Ridge, for appellant.
Louis A. Gerdes, Jr., New Orleans, for appellee.
Before GULOTTA, BYRNES and WARD, JJ.
GULOTTA, Judge.
In this supermarket slip and fall comparative negligence case, defendant Winn Dixie Louisiana, Inc. (Winn Dixie), appeals from a $180,000.00 jury verdict in favor of plaintiff.
Winn-Dixie's contentions on appeal are threefold: 1) that the jury erred in finding liability; 2) that plaintiff failed to prove medical causation between the fall and his alleged head and back injuries; and 3) that the verdict is excessive. We disagree. Accordingly, we affirm.

LIABILITY
The accident occurred on the afternoon of Friday, February 13, 1981, in the Winn Dixie store on St. Bernard and Galvez Avenues in New Orleans. Plaintiff, Raynell Rollings, testified he had slipped and fallen backward on an "egglike" substance as he was pushing his basket through a check-out aisle.
Winn Dixie claims that there was no credible evidence of a foreign substance on the floor causing plaintiff to slip and fall. Alternatively, it argues that it exercised reasonable care to provide clean-up procedures and supervision, and is not liable for plaintiff's injury. We disagree.
Rollings' version of the accident was corroborated by Douglas M. Cornish, a fellow shopper behind him in the check-out line, *1134 who saw broken eggs on the floor with grocery cart tire tracks in them after Rollings had fallen.
Fernand Gettridge, Winn Dixie's assistant store manager noted something "wet" on Rollings' pants and "a drop of something on the floor" that was "fresh" when he assisted Rollings after his fall. Dianne Austin, a cashier bagging groceries, observed Cornish (the fellow shopper) and the plaintiff enter the store together. Although she saw Rollings' basket "go over", she did not know what Rollings had slipped on and did not check the floor. She remembered seeing eggs in the top of Rollings' basket, however, and saw a carton of eggs with "drippings" from it in the hands of "whoever came over to clean it up". The other witnesses did not testify that they saw eggs in plaintiff's basket before the fall, and plaintiff denied that he had eggs in his basket. Another employee, Annie McGowan, saw Rollings and Cornish "laughing" in the checkout line before the incident, but did not see the fall and did not know if anything was on the floor.
Once a plaintiff proves the existence of a foreign substance on the floor of a business establishment that caused him to slip and fall, the burden shifts to the store to exculpate itself from a presumption of negligence. Kavlich v. Kramer, 315 So.2d 282 (La.1975); Smith v. Winn Dixie Store of Louisiana, Inc., 389 So.2d 900 (La.App. 4th Cir.1980); Hanzo v. Travelers Ins. Co., 357 So.2d 1346 (La.App. 4th Cir.1978). The store owner can carry the burden by establishing that it was free from fault and exercised reasonable portective measures, including periodic inspections to maintain the floors and aisle free of substances or objects that may cause customers to fall. Kavlich v. Kramer, supra; Gonzales v. Winn-Dixie Louisiana, Inc., 326 So.2d 486 (La.1976); Smith v. Winn Dixie Stores of Louisiana, Inc., supra.
Applying these guidelines to the facts of the instant case, we conclude that Rollings successfully carried his burden of showing a slip and fall on a foreign substance in the supermarket check-out aisle. Although Winn Dixie attempted to prove collusion between plaintiff and his corroborating witness Cornish, both denied any prior acquaintance. We cannot say under these circumstances that the jury erred in believing Rollings' version of the accident.
Having concluded that Rollings proved the existence of the foreign substance, we further conclude that Winn Dixie failed to exculpate itself from the presumption of negligence.
Concerning Winn Dixie's cleaning procedures, Gettridge, the assistant store manager, testified that there is "constant" cleaning of the store but that it is not cleaned on a "regular schedule". He stated that it is "swept about three or four times a day as needed" and that he, his employees and customers "are constantly watching for breakage". Although Gettridge testified he "constantly" walked the floors, most of his time on the floor is spent looking for shoplifters. He could not specifically recall the last time he had inspected the floor on the day of the accident, although he estimated that it was within an hour before Rollings' fall. He could not remember if he had looked in the particular aisle where Rollings fell. In response to a question whether he looks in each cashier's aisle, he stated, "It depends on what my eyes are glancing at."
Based on this testimony, we conclude that defendant's random procedure of maintaining the floor was insufficient supervision under the circumstances. Furthermore, evidence is lacking to show how soon the check-out aisle area had been cleaned prior to plaintiff's accident. The store manager's "estimated guess" that it was "within the hour span" clearly does not indicate that systematic inspections or other reasonable protective measures had been taken.
Accordingly, we find no error in the jury's finding that Winn Dixie was "guilty of sub-standard conduct which proximately caused plaintiff's injuries."

CAUSATION
Plaintiff complained of head and back pain. His treating neurosurgeon diagnosed *1135 his head pain as "post-concussion state" that will resolve without specific treatment, and his back condition as a rupture of the L4-L5 disc for which he suggests surgery.
Winn Dixie contends that Rollings' back problem was not caused by the supermarket fall, but rather resulted from two earlier traumas to Rollings' back in November, 1978, while working on his car, and again in July, 1980, when he fell in a bus. Defendant further argues that Rollings head complaints resulted from a separate incident in April, 1979, when he was hit in the mouth with a bull horn microphone during a public demonstration.
After conservative treatment failed to relieve Rollings' pain from the February 13, 1981 supermarket accident, he consulted Dr. Raeburn Llewellyn, a neurosurgeon, on August 24, 1981, with complaints of low back pain "shooting through" his legs (more so on the left), headaches, blurry vision, and blackouts. Rollings exhibited a normal head examination, but signs suggested a possible disc lesion. During hospitalization from November 29 through December 11, 1981, Dr. Llewellyn identified a disc rupture from x-rays of the lower back showing a marked narrowing of the L5-S1 disc space and from an abnormal CAT scan of the lumbar spine revealing a rupture of the L4-L5 disc.
Dr. Llewellyn was of the opinion that plaintiff's low back problem is a consequence of the February 13, 1981 slip and fall in Winn Dixie. Although this physician recognized that plaintiff had been treated for previous back injuries, he concluded that Rollings had recovered from these earlier problems prior to the Winn Dixie incident.
Another neurosurgeon, Dr. John F. Schumacher, examined plaintiff on one occasion and reviewed his prior x-rays and test results. This physician found no lumbar spasm or any objective findings to support plaintiff's complaints of low back pain. He detected a scoliosis deformity of the lumbar spine but no disc space narrowing. Dr. Schumacher could not identify any disc abnormality or rupture and found no objective evidence of persistent head injury. On cross examination, Dr. Schumacher testified, however, that the right sided bulge at the L4-L5 disc level might very well be a disc nodule or bulge, although it would be "hard" for this abnormality to produce the left-sided pain complained of by plaintiff.
The jury also had the benefit of the testimony of Dr. James T. Williams, an orthopedic surgeon, who examined Rollings on November 13, 1981, nine months post-accident. According to this physician, plaintiff gave a history of striking his head and back on a NOPSI bus, but no history of the fall in Winn Dixie in February, 1981. Dr. Williams found spasms in plaintiff's neck muscles but not his back. He testified that x-rays of plaintiff's lumbar spine were normal, except for pre-existing scoliosis unrelated to pain, and did not show a ruptured disc. He was unable to find a reason for plaintiff's pain.
Dr. Leon A. Weisberg, a neurologist, also testified. This physician had examined Rollings on December 20, 1979, over a year before the Winn Dixie accident, to determine whether he had a social security disability. At that time Rollings had given history of low back pain from a hit and run accident while working on his car and of neck pain, headache, blurry vision from the April, 1979 demonstration incident. In the December, 1979 examination, Dr. Weisberg found no objective signs or evidence of a herniated disc or acute lumbosacral strain, and had no impression as to the cause of Rollings' low back pain.
Dr. Weisberg examined Rollings again on June 12, 1980, when he found evidence of muscle spasm in the lower back, which he diagnosed as marked lumbosacral strain syndrome. There was no evidence of nerve or spinal cord injury, however, and he did not feel plaintiff had a disc herniation in June, 1980. Because of the low back pain, however, Dr. Weisberg felt Rollings was temporarily totally disabled from any work activity and recommended that he be treated with anti-inflammatory drugs and muscle relaxants.
*1136 The medical evidence considered, we cannot conclude that the jury erred in its conclusion that the Winn Dixie accident caused plaintiff's lumbar disc injury. Dr. Llewellyn's findings and opinion together with Dr. Weisberg's earlier examinations support a conclusion that Rollings suffered a disc rupture attributable to the February, 1981 supermarket fall, rather than his earlier accidents.

QUANTUM
The jury awarded Rollings $180,000.00 as the "total amount of damages". This amount includes special medical expenses of approximately $12,500.00.[1] According to Winn Dixie, the remaining $167,500.00 in general damages is "clearly excessive", even assuming Rollings suffered a ruptured disc in the accident. We disagree.
The twenty-eight year old plaintiff testified at length concerning his problems since the February 13, 1981 accident. After hitting his head and back in the fall, he felt as if he "broke something". He testified concerning his persistent low back pain "shooting through" his leg and leading to his treatment by Dr. Llewellyn after his condition failed to respond to conservative treatment two or three months post-accident. Plaintiff was hospitalized for a two week period in November and December, 1981, when he remained in traction for ten days.
At trial in November, 1982, plaintiff complained of leg pains shooting into his toe, particularly when walking on uneven surfaces. He suffers from daily headaches, blurry vision and blackouts when he is active. His lower back ache persists.
Dr. Llewellyn, who had last examined plaintiff on October 27, 1982, three weeks prior to trial, found no improvement in plaintiff's back or leg complaints but some lessening of his headaches and blackout spells. In the last visit, plaintiff exhibited spasm of the low back muscles.
Dr. Llewellyn testified that without surgery to remove the ruptured disc, plaintiff cannot be reasonably comfortable jumping, climbing, or lifting, and would have to periodically rest and apply moist heat. With surgery, Rollings would be able to do 80-85% of his daily activity. There is a 20% chance that surgery would not improve his condition. Rollings has declined the suggested operation.
Although there was no expert testimony concerning loss of income, Rollings testified that he had earned $140.00 per week in a seafood market prior to receiving $280.00 per month in social security disability income before the Winn Dixie accident. He stated that he had been thinking of returning to work before the supermarket injury, but cannot work now because of his inability to lift oyster sacks.
Considering the nature of plaintiff's injury, his pain and suffering, and some loss of earning capacity because of his disability, we cannot say the amount awarded by the jury, though high, is an abuse of its discretion.[2]
Having so concluded, we affirm the judgment.
AFFIRMED.
NOTES
[1] This $12,000.00 figure includes $5,000.00 in past medical expenses and $7,500.00 in anticipated hospitalization and surgical fees should plaintiff elect to undergo the proposed back operation. The $180,000.00 award was reduced to a $162,000.00 judgment in favor of plaintiff based on the jury's finding that plaintiff had been 10% at fault for his injury.
[2] Although generous, the jury's award of $180,000.00 includes special past and future medical expenses of $12,500.00. The remaining $167,500.00 in general damages for plaintiff's pain and suffering and loss of earning capacity comports with amounts awarded in similar cases involving rupture of lumbar discs resulting in permanent, partial disability. See Lofton v. Whimper, 425 So.2d 1307 (La.App. 4th Cir. 1983); Suhor v. Gusse, 403 So.2d 83 (La.App. 4th Cir.1981), writ denied 414 So.2d 1217 (La. 1982); Daigle v. Lang, 377 So.2d 1384 (La.App. 4th Cir.1979), writ denied 381 So.2d 510 (La. 1980); Johnson v. Wicks, 356 So.2d 469 (La. App. 1st Cir.1977).