486 So.2d 1030 (1986)
Floyd L. MYERS, et al., Plaintiffs-Appellants,
v.
FORD MOTOR COMPANY, et al., Defendants-Appellees.
No. 17636-CA.
Court of Appeal of Louisiana, Second Circuit.
April 2, 1986.
*1032 Luffey & Deal, by Philip T. Deal, Monroe, for plaintiffs-appellants.
McLeod, Swearingen, Verlander & Dollar by Elmer G. Noah, II, Monroe, for defendants-appellees.
Before HALL, MARVIN and JASPER E. JONES, JJ.
JASPER E. JONES, Judge.
This is an appeal of a judgment awarding Floyd L. Myers damages for injuries received in an automobile accident and rejecting the demands of Gloria Randall for personal injury damages sustained in the accident. The plaintiffs-appellants are Floyd L. Myers and his sister, Gloria Randall. The defendant-appellee is the Northern Assurance Company of America, liability insurer of the vehicle occupied by appellants. The defendant's policy had limits of $100,000 per person and $300,000 per accident.[1]

FACTS
On November 28, 1981, John Randall, husband of Gloria Randall, was driving their Ford Bronco in Richland Parish, Louisiana, when the rear axle broke causing the vehicle to overturn.
*1033 Floyd L. Myers was thrown from the vehicle and sustained multiple rib fractures, a concussion, multiple abrasions and contusions and a back injury with nerve root irritation.
Gloria Randall sustained injury to her right wrist and hand, headaches, contusions, a concussion, lacerations of her face and a back injury.
At trial, Floyd L. Myers offered the deposition of Dr. C. Russ Greer in support of his claim that he sustained a disc rupture at the eighth thoracic vertebra in addition to his other injuries. Myers also offered the testimony of Dr. Charles Bettinger, a Professor of Quantitative Methods at McNeese University, in an effort to establish the current value of the economic losses resulting from the accident. Dr. Bettinger's calculations and opinions were based upon the assumption that Floyd L. Myers would never be able to return to his former employment of operating heavy work equipment.
Gloria Randall sought to establish the defendant's liability under LSA-C.C. art. 2317 by analogy to jurisprudence recognizing the right of an injured spouse to recover in a direct action from the insurer of a negligent spouse.
The court in written reasons found Floyd L. Myers had not proven by a preponderance of the evidence that a thoracic disc rupture had resulted from the accident and awarded him $30,000 for past and future general damages. The written reasons stated Myers had not established that he was disabled to such a degree that he could not return to some type of heavy equipment operation and awarded him $30,000 for past and future loss of earnings and $8,292.02 for past and future medical expenses.
The court concluded Gloria Randall's community property ownership interest in the Ford Bronco precluded liability under LSA-C.C. art. 2317 as she was deemed to have had custody of the vehicle and to have been aware of the defective axle.
The judgment awarded Floyd L. Myers $68,292.02 in damages and rejected the demands of Gloria Randall.
Floyd L. Myers and Gloria Randall have appealed and the defendant has neither appealed nor answered.
The assignments of error present the following issues for decision:
(1) Did the trial court abuse its discretion in awarding Floyd L. Myers only $30,000 for general damages and only $30,000 for loss of earnings?
(2) Was the trial court clearly wrong in ruling that Gloria Randall's community property interest in the Ford Bronco precludes her from establishing a claim under LSA-C.C. art. 2317?
We amend the judgment in favor of Floyd L. Myers and increase the general damage award to the extent that his total judgment is for $100,000.00. We do not reach the issue of the adequacy of the $30,000 award for loss of earnings.
We reverse the judgment against Gloria Randall and award her general and special damages as compensation for the injuries sustained.
Issue # 1Did the trial court abuse its discretion in regard to the general damage and loss of earnings award?
General Damage Award

Law On the Evaluation of Expert Medical Testimony and the Assessment of General Damage Awards
A trial court has the discretion to accept or reject expert medical or lay opinion and may also substitute its common sense and judgment, after weighing and evaluating the testimony, when such a substitution appears warranted upon the record as a whole. Tyler v. Richardson, 476 So.2d 899 (La.App.2d Cir.1985), writ denied, 478 So.2d 907 (1985). Before a general damage award can be altered on appeal, the record must show a clear abuse of the trial court's discretion. The particular injuries sustained and their effects on a particular person is the proper perspective from which to make this determination. *1034 Only after an articulated analysis of the facts discloses that the award made is greatly disproportionate to the mass of prior awards for truly similar injuries may the appellate court resort to an analysis of prior awards in arriving at the lowest amount which was reasonably within the trial court's discretion. Emerson v. Empire Fire & Marine Ins. Co., 393 So.2d 691 (La.1981); Reck v. Stevens, 373 So.2d 498 (La.1979); Tyler v. Richardson, supra; LSA-C.C. art. 1934(3).[2]
The trial court, in its written reasons for judgment, acknowledged that Myers had suffered severe pain for a prolonged time but concluded that a larger general damage award was not justified as the evidence did not establish that a thoracic disc rupture had resulted from the accident. The court did concede that the evidence established some type of compression effect on one or two thoracic nerve roots in the T6-T9 area of the spine.[3] The court noted that Floyd had elected to undergo a conservative course of treatment and progress was being made in his treatment.
The defendant argues that the Myers' election not to take a myelogram examination, or to undergo any needed surgery that the test may uncover, is proof that the injuries are not as severe as claimed.
The evidence of Myers' injury and resulting disability consists primarily of the depositions of two medical experts and the trial testimony of Myers and his wife. We note that Myers was thrown from the Bronco to the shoulder of the road during the course of the accident.
Dr. Lester Johnson, an expert in the field of general surgery, was the initial treating physician for Myers. Dr. Johnson testified Myers' accident caused him to sustain a crushing-type injury to his chest resulting in pulmonary contusions to his lung tissue. The witness also related Myers suffered a concussion, five broken ribs and injury to his thoracic vertebrae in the T6-T9 region of the spine. Dr. Johnson added that the pulmonary contusions placed Myers in a life-threatening situation that wasn't resolved until 72 hours after the accident. When Dr. Johnson was asked to rate the severity of the crushing-type injury to Myers' chest on a scale of one to ten, he rated Myers' injury as an eight and added that Myers was lucky to have made it to the hospital alive. Dr. Johnson treated Myers during the six days he was in the hospital and he examined Myers on December 9, 1981, and on January 24, 1983. Dr. Johnson then referred Myers to Dr. C. Russ Greer, a neurosurgeon, due to Myers' complaints of chronic pain in his chest, rib cage, shoulders and upper back. When asked if these injuries would heal completely, as did his lung contusions, Dr. Johnson testified as follows:
A. "... But I don't know of any way of predicting. He did have a serious injury to his chest, and I don't know if he'll ever recover totally from that or not... I would have hoped that he would have been doing well in six to nine months following his injury, as far as being able to cope with the situation. When you crush your chest, you're never going to be like you were. I mean, there's just no way ..." [emphasis added]
Dr. Greer testified he first examined Myers on July 14, 1983. This examination revealed complaints of pain in Myers' left shoulder, neck and mid-thoracic area of the spine which radiated around both sides of his rib cage. This witness subsequently treated Myers on August 23, 1983, and on August 28, 1984. This last visit was approximately one month prior to the trial and almost three years after the accident. Dr. Greer testified as to Myers' condition as follows:

*1035 A. "... He mentioned that the ribs in the left chest seemed painful to him, and he felt as though there was some swelling associated with it. He also felt as though there was some swelling and soreness of the muscles on each side of the spine in his back between his shoulder blades. He felt as though the pain was worse on the left than the right, and the examination showed tenderness over the spinous processes of T6 through T9. He complained of pain with compression of the left rib cage, the pain being in the area of T6 through T9 ribs on the left. Compression anteriorly caused pain the midaxillary area also caused pain in that local area. On sensory evaluation, he had diminished pinprick in the dermatomal fashion to include T6 through T9, which begins at the spinous processes and continues around to the midaxillary level on the left."
When asked to give an opinion as to the medical cause of Myers' chronic complaints of pain, Dr. Greer testified as follows:
Q. Based on the history that Mr. Myers related to you from the first visit involving the automobile accident and the rib fractures, ... what would be your opinion as to the most likely cause of Mr. Myers' persistent complaints?
A. I think he has some kind of compression effect on the thoracic nerve root, one or two, perhaps in the area of T6 through T9 on the left. This could be from a thoracic disc rupture, or some other bony abnormality causing neuro-irritation at the site of the compression of T8.

Q. Regardless of which of those two or more conditions might exist, in your opinion, if Mr. Myers had not had any problems or complaints of pain in that area prior to the accident in November of 1981, in which he suffered multiple rib fractures, would it be your opinion that it's more likely than not that that accident and the injuries suffered therein were, and are, the cause of his complaints of pain?
A. From the history, and from the findings, I would feel that there would be a cause and effect relationship. [emphasis added].
Dr. Greer also testified that Myers' injuries had caused him to become partially disabled but did not assign a percentage of disability. Dr. Greer evaluated Myers' ability to work as follows:
"No. I would anticipate some type light activity he could perhaps deal with. Anything requiring rigorous or strenuous activity at all would aggravate his problem."
When asked to give his prognosis of Myers' condition, Dr. Greer testified that he would "have to assume that he's going to continue to have the problem."
At trial, Myers testified that he underwent six days hospitalization and was confined to a hospital bed in his home for three months. He also related that his decision to undergo a conservative course of treatment was based upon his acute fear of the myelogram test, and the "foot-long" needle used in that procedure, as well as his horror of any needed back surgery that the test may indicate was necessary. Myers testified that chosen course of treatment, by way of medication, has allowed him to reach a level of pain that he can tolerate. When asked to relate his present condition and the progress that has been made in his treatment Myers responded as follows:
Q. How is your current condition right nowhow do you feel?
A. I'mI'm better than I was a year agoyou knowbut I stillI still got a lot of pain in my back.
Q. What part of you has improved over the last year?
A. What part has improved?
Q. Yes, what part of your body has got better?
A. My lungsmy lungs has improved and my chest has improved someyou knowwell it's improved a whole lot. But I stillI'm stillsomething's wrong with my backyou knowit's under my left shoulder and under my *1036 right one. But my right one don'tit don't hurt near as bad as the left one.
Q. Well has your back that you're pointing at improved over the past year?
A. No.
Q. Has it gotten any worse?
A. No, justit's just there. I mean it justit's just a steady pain. My shoulder has got some bettermy left shoulder has got some better over theover the last year.
Q. The back area that you said has not improved, is that an area that gets worse when you try to engage in your former occupation?
A. Yeah, yeah it doesit certainly does. I mean it gets unbearable, where you can'tif you can't rest at night, you can't work the next dayyou knowit gets that bad.
Myers' wife testified her husband has constantly complained of pain since the accident and has not been able to return to his prior active lifestyle or his former employment as a heavy equipment operator. She stated financial pressure has forced him to return to work doing far less strenuous farming activities in West Carroll Parish.
At the time of the accident Myers was a 39 year old heavy equipment operator with an active and vigorous lifestyle of manual labor and heavy equipment operation with no history of any prior disability. Since the accident, Myers has suffered prolonged and severe pain that has drastically altered his family life and adversely affected his ability to earn a living. Myers related that the constant pain since the accident has made him irritable all the time and has altered his personality and outlook on life. He also testified the pain has robbed him of half of his strength with a corresponding effect on the amount of work he can do. His wife and older son have had to go to work to compensate for his diminished income. The long-term prognosis by both medical experts reveals that Myers is at least partially disabled and will continue to experience chronic pain for an indefinite time. Myers has tried on several occasions since the accident to operate a bulldozer and backhoe but the constant jar and body activity necessary to operate this type of machinery caused him such pain that he could not return to this type work. He has been able to operate farm tractors to cultivate land and combines to harvest the crops. He now has a job working for a farmer earning $110.00 per week in the winter and $150.00 for work during the spring and summer. The jurisprudence reveals that the $30,000 general damage award made by the trial court is greatly disproportionate to the mass of prior awards for similar spine related injuries.[4]
We determine from a review of the record the trial court clearly abused its discretion in awarding only $30,000 based upon a finding that Myers failed to prove a thoracic disc rupture. The particular injuries sustained, and their effect on Floyd L. Myers, conclusively establishes that he has suffered severe pain and will continue to do so indefinately. All of the expert and lay testimony on this issue is in agreement as to this prognosis. Dr. Johnson testified there was "no way" Myers could ever totally recover from his chest injury and Dr. Johnson testified that Myers was partially disabled as a result of the accident. As to the cause of this severe pain, Dr. Johnson testified its source could be either a thoracic disc rupture or some other source of neuro-irritation at T8. Dr. Johnson's testimony is fully corroborated by the testimony of Myers' neurologist, Dr. Greer. This testimony was not rebutted by the defendant. There is no factual basis to support the trial court's finding that the failure to positively establish a ruptured thoracic disc requires the conclusion that the injuries sustained are not as extensive as claimed. The medical testimony fully supports *1037 Myers' testimony of sustaining great aggravation of his pain by performing work of operating heavy dirt moving equipment. The testimony of Dr. Greer does establish the pain experienced is caused from nerve root irritation which could be caused by a disc rupture or other spinal malfunction at the T6-T9 level.
The initial life-threatening nature of the injuries has evolved into a severe and constant source of pain for Myers. Although medication has reduced the pain to an endurable level, all of the testimony establishes that he has been severely and adversely affected by this chronic condition and will continue to be so affected in the long-term.
Myers' election to forego a myelogram or any needed back surgery does not affect his right to recover the maximum general damages the law allows. No medical expert actually recommended disc surgery or testified that any needed operation would result in Myers' recovery. It is significant that Myers, even with his substantial disability and related pain, is now able to operate a farm tractor and combine. These facts distinguish the present case from that in Neff v. Allvend, Inc., 474 So.2d 1027 (La.App. 5th Cir.1985). Such medical procedures are risky and disc injuries are treated conservatively. Abshire v. Dubois, supra. In such a factual context Myers has the right to choose not to expose himself to such potential hazards. Cf. Rollins v. Winn Dixie Louisiana, Inc., supra. The healing effect of time, together with medication, has caused Myers' pain to diminish to a tolerable level. The improvements in his pain has made it possible for him to do some work even though he cannot return to the work of operating bulldozers and backhoes. When these circumstances are considered together with the inherent uncertainties in this type of back treatment we find Myers' action, in rejecting the myelogram and possible back surgery, to be reasonable.
Having concluded that the trial court clearly abused its discretion in awarding an insufficient amount for past and future general damages, and having decided that Myers is not to be penalized for choosing a conservative course of treatment, we now turn to a review of prior awards as an aid in determining the lowest amount that was reasonably within the trial court's discretion.
In Rollings v. Winn Dixie Louisiana, Inc., supra, the court awarded a 28 year old plaintiff $167,500 in general damages for a rupture of the L4-L5 disc. The plaintiff was subsequently hospitalized for two weeks and underwent ten days in traction. An examination two years after the accident, and immediately prior to trial, revealed lower back and lower leg pain as well as daily blackout spells and dizziness. The plaintiff declined to undergo back surgery even though medical testimony established that there was an 80% chance the operation would improve his condition.
In Abshire v. Dubois, supra, the plaintiff sustained a rupture of the L4-L5 disc in 1979 and was still suffering from pain two years after the injury. The court noted that there was a good possibility that the pain would never go away and that the plaintiff would have to live with that condition. The court also recognized that many disc injuries are treated conservatively and that surgery in about 15% of the cases does not help the patient. The plaintiff was awarded $100,000 for bodily injury, mental anguish and disfunction.
In Ross v. Noble, supra, the plaintiff was awarded $75,000 in general damages for ruptured discs at two cervical levels. He still suffered from pain in the left side of the neck and from mild spasms two years after an automobile accident. The plaintiff agreed to undergo disc surgery in the immediate future but no prognosis was given.
In Wilson v. Wal-Mart Stores, Inc., supra, the plaintiff sustained a ruptured disc at the L5 level as well as damage to the nerve root in that same area. The disc was surgically removed but the complaints of pain in the upper back and lower extremities persisted. Two years after the accident which caused the injuries the plaintiff underwent a series of epidural nerve blocks in addition to physical therapy and pain *1038 medication. The plaintiff was awarded $100,000 for general damages.
Considering the foregoing jurisprudence, we determine that the lowest general damage award within the trial court's reasonable discretion was $65,000. As the defendant's policy limits are $100,000 per person, we increase the $30,000.00 general damage award by $31,707.98, to the total amount of $61,707.98, which, when added to the loss of earnings and special damages award of the trial court in the amount of $38,292.02, will equal the sum of $100,000.00.
Loss of Earnings
We do not reach the issue of the adequacy of the award for past and future loss of earnings as the policy limits have been exhausted for Floyd L. Myers by the increase of his general damage award.
Issue # 2Did the trial court err in ruling that a spouse's community property interest precludes a claim under LSA-C.C. art. 2317?
Gloria Randall's right of action under LSA-C.C. art. 2317

Law On The Right To Establish A Tort Claim Against The Liability Insurer Of One's Spouse
Louisiana tort law is premised upon a concept of fault that is broad and comprehensive. The codal scheme imposes responsibility not only for damage caused by a person's negligence but also when a person has a legal relationship to a damage causing thing. Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982). The method of legal analysis for a negligence claim under LSA-C.C. art. 2315 and a strict liability claim under LSA-C.C. art. 2317 is virtually identical, the difference being that a claimant in the latter situation is relieved only of proving that the owner knew or should have known of the risk involved. In both cases the claimant must prove that under the circumstances, the thing presented an unreasonable risk of harm which resulted in damage. B. Olinde & Sons Co., Inc. v. State, Etc., 421 So.2d 370 (La. App. 1st Cir.1982); Kent v. Gulf States Utilities Co., supra. The law prohibits suits between non-judicially separated spouses except in specified situations. LSA-R.S. 9:291.[5] When a wife is damaged by her husband's negligence she cannot sue her husband but may sue his liability insurer directly under LSA-R.S. 22:655. Landrum v. United States Fidelity & Guaranty Co., 151 So.2d 701 (La.App. 3d Cir.1963); Soirez v. Great American Insurance Company, 168 So.2d 418 (La.App. 3d Cir.1964). The Direct Action Statute gives an injured married person a special right of action against a spouse's insurer where there exists a procedural bar in the form of LSA-R.S. 9:291 to the assertion of a cause of action directly against a spouse. Cf. Farrell v. Wilbert, 369 So.2d 1087 (La. App. 1st Cir.1979), writ den., 371 So.2d 1342 (La.1979); Arrow Trucking Co. v. Continental Ins. Co., 465 So.2d 691 (La. 1985); Soirez v. Great American Insurance Company, supra.
We conclude Gloria does have a right of action directly against the defendant. We find no substantial distinction between the policy reasons underlying a spouse's right to sue directly the insurer of the spouse who caused injury by negligence and a right of action based upon LSA-C.C. art. 2317 against the spouse's insurer.
As Gloria Randall has a right of action against the insurer of her husband, we now address the merits of Gloria's cause of action under LSA-C.C. art. 2317. Is the defendant liable under LSA-C.C. art. 2317?
"We are responsible, not only for the damage occasioned by our own acts, but *1039 that which is caused by ... the things which we have in our custody ..." LSA-C.C. art. 2317. The custody requirement does not depend upon ownership but equates to a relationship to a thing which gives rise to a right of supervision, direction and control as well as the right to receive a benefit. Loescher v. Parr, 324 So.2d 441 (La.1975); Kent v. Gulf States Utilities Co., supra; Colleps v. State Farm General Ins. Co., 446 So.2d 988 (La. App. 3d Cir.1984). In order to establish liability and the entitlement to recover under LSA-C.C. art. 2317 a plaintiff must prove: (1) the thing had a vice or defect; (2) the thing was in the custody of the defendant; and (3) the injury or damage was caused by the vice or defect. When the plaintiff has proved these elements, the burden shifts to the defendant who may only escape liability by proving the damages were caused by victim fault, third-party fault or an irresistible force. Ross v. Lewis, 446 So.2d 1322 (La.App. 2d Cir. 1984).
The trial court, in written reasons for judgment, considered the following facts as controlling Gloria's claim under LSA-C.C. art. 2317: (1) that the vehicle was community property and that Gloria was a co-owner; (2) that Gloria had the right to use the vehicle should the need arise; and (3) at the time of the accident Gloria was receiving a benefit as she was a passenger in the vehicle and was returning from Columbia, Louisiana, after a visit with her sister. The court held that Gloria, as owner having the custody of the Ford Bronco, should be deemed to have knowledge of the defective axle and should bear responsibility for the injuries sustained.
Gloria argues that LSA-C.C. art. 2351 precludes her legal custody of the vehicle as it was registered in only her husband's name. She also asserts that she was not the factual custodian as her husband was in actual control of the operation and use of the Ford Bronco and any rights she had in the use of the vehicle only arose in emergency situations.
We conclude that resolution of the custody issue is depositive of the defendant's liability to Gloria under LSA-C.C. art. 2317.
The record establishes that three months prior to the accident Gloria's husband purchased the Ford Bronco on his own initiative and for his exclusive recreational use. The vehicle was housed in a work shop behind the Randall home and separated from the other vehicles owned by Gloria and her husband. Gloria testified she observed her husband working on the vehicle but never participated in the work as she was not a mechanic. Gloria's husband testified there was only one key to the vehicle and it was kept either in his pocket, in the vehicle or on a table next to his bed. He also related that any right Gloria had in the use of the Ford Bronco would arise only in an extreme emergency and then only if her personal automobile and truck were inoperable or unavailable. Gloria testified she never went into her husband's pockets or into his night stand and that she would have considered driving the vehicle only in an extreme emergency when no other transportation was available. The record also reveals that prior to the date of the accident Gloria had never set foot in the vehicle.
In Williams v. Hempen, 396 So.2d 999 (La.App. 3d Cir.1981) the court held that the defendant-lessee had the custody of a trash dumpster even though the City of Alexandria, Louisiana, was the owner-lessor of the thing and received a direct monetary benefit in the form of lease payments. The court noted that the owner-lessor in fact exercised little or no control over the property as in the five years prior to the accident in question the city had never repaired, serviced or maintained it. The court concluded that under the reality as it existed at the time of the accident, it was the defendant-lessee who in fact exercised direction and control over the dumpster and who derived a benefit from it.
In Goudchaux v. State Farm Fire & Cas. Co., 407 So.2d 1317 (La.App. 3d Cir. 1981), writ den., 412 So.2d 1114 (La.1982) the court held that a homeowner who had *1040 rented a sewer auger for two hours did not have the requisite relationship to the thing to trigger LSA-C.C. art. 2317. The homeowner had rented the equipment from the Rent-It Company and his neighbor was injured when the auger malfunctioned and severed part of a finger. The court held that the homeowner's right to use the equipment for a short period of time did not negate the custodial relationship of Rent-It as the business still had the responsibility for maintaining the auger and, over the long-term, the direction and supervision over the property. The court also noted the lessor received a monetary benefit from the rental of the equipment. The court concluded that the homeowner's relationship to the thing was insufficient to result in the application of LSA-C.C. art. 2317 even though he did receive some short-term benefit from its use.
We conclude that Gloria has established the defendant's liability under LSA-C.C. art. 2317. Gloria's legal relationship as co-owner, or the legal limitations as to her right to manage the vehicle under LSA-C.C. art. 2351,[6] is not the controlling consideration. The jurisprudence clearly establishes that the factual custodial relationship to the property provides the true inquiry to be made in order to determine if adequate custody exists to create such strict liability. Such an inquiry reveals that under the reality of the situation as it existed at the time of the accident, Gloria did not have the requisite custody relationship to the vehicle to preclude the application of LSA-C.C. art. 2317. The dominion exercised over the Ford Bronco by Gloria's husband clearly reveals that any potential right Gloria had in the use of the vehicle is far removed from the type of real and tangible benefit contemplated by the jurisprudence. As in Williams v. Hempen, supra, the control exercised by Gloria's husband since the purchase of the vehicle establishes that she, even though an owner under the law, had no actual control over the property at all. As in Goudchaux v. State Farm Fire & Cas. Co., supra, the short-term benefit derived as a result of Gloria riding as a passenger after returning from a visit with her sister is not enough, in and of itself, to negate the overriding control and supervision of the vehicle by Gloria's husband. This conclusion is buttressed by the fact that this was the only time she had ever ridden in the Ford Bronco. The totality of the circumstances establish Gloria did not enjoy the benefits of a custodial relationship with the Bronco contemplated under this code article.
Having determined the defendant is liable under LSA-C.C. art. 2317, we turn to an analysis of Gloria's damages.
An appellate court is empowered to award damages where the trial court initially rejects plaintiff's demands and the record is complete with regard to damages. Holman v. Reliance Ins. Companies, 414 So.2d 1298 (La.App. 2d Cir. 1982), writ den., 420 So.2d 164 (La.1982). An appellate court initially assessing general damages is not obligated to make an award equal to highest or lowest dollar amounts within the trial court's judgment but to make an award that is just and fair based upon the record. Wall v. American Emp. Ins. Co., 377 So.2d 369 (La.App. 2d Cir.1979), aff., 386 So.2d 79 (La.1980).
General Damages
Dr. Johnson testified that he was Gloria's treating physician immediately after the accident. His diagnosis was multiple lacerations and contusions as well as a possible concussion. Gloria was hospitalized for six days immediately after the accident. She was treated for a severe injury to her right forearm, wrist, hand and other soft tissue injury. She had sustained serious lacerations to her right forearm and wrist. Gloria was re-admitted to the hospital shortly after her discharge suffering from severe headaches. Dr. Johnson *1041 referred Gloria to Dr. Robert Massingill for the headache problem. The witness also related that he last saw Gloria in September of 1982, after ten months of treatment, and physical therapy. He found she had less pain in her wrist but expressed the opinion that the severe scarring could cause nerve entrapment, pain and disability in the future. Dr. Johnson described the injury to Gloria as follows:
Q. Okay. Would you categorize this as a severe sprain? Would that be what it would be?
A. Well, I wouldI think that's fair to say, a strain or a severe sprain to the ligamentous structures of the wrist, as well as a severe soft tissue injury, just torn asunder; a lot of the skin and soft tissue covering the bones and the ligamentous and tendinous structures of the wrist.
Q. And by being "torn asunder,"
A. But
Q. do you mean that it was lacerated to such an extent that all this was exposed?
A. That's correct; avulsed, and had to be laid back on it. We thought it very likely we would have to put a skin graft on it, but we did not have to. It healedshe did have some trouble with healing in that area. It was a significant injury. There was a lot of glass in it, and she had some glass come out through that, that we picked out for quite a while.
Q. Was the any nerve damage to her wrist?
A. Oh, I'm sure there was.
Dr. Robert Massingill, an expert in internal medicine, testified he first saw Gloria on December 10, 1981, after she was readmitted into the hospital for painful, constant headaches. Dr. Massingill testified Gloria complained of headaches almost every day since the accident as well as a dull pain in the occipital area of her head. She also complained of blindness and blurry vision in the left eye. Dr. Massingill's examination revealed some spasm and tenderness over the trapezuis muscle which indicated a muscular headache. When asked whether the accident was the cause of such pain the witness responded as follows:
Q. And what about the muscle contraction-type of headache? Could the trauma have a cause-and-effect relationship in that situation?
A. Yes, it could in two ways. One would be from the stress and anxiety of what had happened to the patient in the accident. And the anxiety and stress, then, could precipitate the headache. And the headaches can become chronic because of a conditioned response that the patient develops. The other way is if the patient incurred some strain injury of the cervical musculature, like a whiplash-type of injury. The muscles of the neck then become tight, and this can sort of extend up into the head and can create a muscle contraction headache in that manner.
Gloria had a history of vascular or migraine headaches with the last one occurring two years prior to the accident. The doctor testified that following the accident Gloria had been experiencing both vascular and muscle contraction headaches. Dr. Massingill also related that he treated Gloria on November 10, 1982, and again on February 3, 1983, and that she was still complaining of headaches on the left side of her head and spasm like pain in her upper left shoulder and back.
Dr. Greer testified he examined Gloria on July 14, 1983, and classified her complaints as headaches, blind spells, right wrist pain and left hip pain. Dr. Greer had Gloria undergo a nerve conduction test, a nuclear bone scan, x-ray examination and a CT scan. The witness testified Gloria had nerve damage to her right hand with a resulting partial disability. He estimated this disability at 20-25%. He evaluated Gloria's back pain as follows:
"A. As she's had this problem this long, she most probably will continue to have some problem present, although unless it progresses, I would not anticipate doing some kind of surgical procedure there. It more than likely will just sort of stay *1042 as a little mild, aggravating, intermittently bothersome problem."
Dr. Gordon Massengale, an expert in the field of family medicine, testified he was Gloria's family physician. He related that since 1976 he has seen Gloria eleven times and on none of these occasions did she complain of any problems with her right hand, wrist or back. Dr. Massengale testified that Gloria's right forearm and wrist were placed in a cast after his first visit on November 29, 1981. She was in the cast for four weeks. Dr. Massengale stated that on the date of the accident Gloria was suffering from disorientation and speech related problems which resolved themselves within twenty-four hours.
Gloria testified the headaches terminated almost two years after the accident after she commenced taking medication prescribed by Dr. Greer. She also testified she still has pain and weakness in her right wrist, arm and top of her righ hand. Gloria related that she has scars all "up and down my arms and hands."
At the time of the accident, Gloria was a 38 year old housewife who was active in her husband's construction business. As a result of the injuries sustained in the accident she has suffered severe pain and discomfort from a lascerated right arm and wrist. She has sustained severe muscular headaches for two years and shoulder and back pain and will continue for an indefinite time. She has sustained scarring and nerve damage to her right hand resulting in a 20-25% partial permanent disability. Before the accident she painted all the houses her husband built and did the painting on his remodeling jobs. She cannot do this work now because of the residual disability in her arm, wrist and hand.
We conclude Gloria should be awarded $50,000.00 for past and future general damages.
Loss of Earnings
The parties have stipulated to a $5,000.00 award for past and future loss of earnings.
Special Damages
Past Medical
Gloria's past medical expenses were introduced into evidence without objection and consist of the following:

(1) Richland Parish Hospital
 (11/28/81-12/4/81) $1,270.81
(2) Richland Parish Hospital
 (12/10/81-12/11/81) 638.99
(3) Richland Parish Hospital
 (12/17/81) 48.67
(4) Richland Parish Hospital
 (2/12/82) 43.06
(5) Dr. Lester Johnson 480.00
(6) Dr. Robert Massingill 225.00
(7) Dr. C. Russ Greer 310.00
(8) St. Francis Medical Center
 (7/27/83-7/29/83) 839.00
(9) St. Francis Medical Center
 (8/31/83) 383.00
(10) Radiology Associates
 (7/27/83) 122.00
(11) Radiology Associates
 (7/29/83) 44.00
(12) Radiology Associates
 (8/31/83) 100.00
(13) Howard Brothers Pharmacy 79.94
 _________
 TOTAL................ $4,584.47[7]
Future Medical
Dr. Charles Bettinger was accepted by the court as an expert in the statistical analysis of economic loss. He testified that each $100 spent by Gloria per year for purchasing medication would equate to $5,680 in compensation for the 39½ years estimated to be remaining in Gloria's lifetime. The defendant does not challenge this estimation.
Dr. Johnson related that the plaintiff had nerve damage to her right wrist.
Dr. Greer testified that Gloria had sustained nerve damage in her right hand and that she was disabled. He estimated that she had a 20-25% partial permanent disability. Both medical experts testified that there was the potential of the injury becoming more disabling over time.
The record establishes that Gloria takes three Flexeril tablets and two Elavil tablets per day, all as prescribed by Dr. Greer for *1043 her disability. The pharmacy bill introduced into evidence shows that fifty (50) Flexeril tablets, which is a 17 day supply, cost $30.09 and that fifty (50) Elavil tablets, a 25 day supply, cost $10.69. This amounts to $40.78 per month for less than a month's supply of medication and equates to $489.36 per year. Applying Dr. Bettinger's formula to this annual sum which is actually less than the cost of this medication for a year, the discounted value exceeds $27,000.00.
Gloria, in brief, seeks the sum of $15,000.00 for her future medical costs. We determine that the record amply supports this amount of future medication expense.

CONCLUSION
We recast the judgment appealed to reflect the awards we have made by deleting the second paragraph of the judgment and adding the following:
IT IS ORDERED, ADJUDGED AND DECREED that:
There be judgment in favor of FLOYD L. MYERS and against THE NORTHERN ASSURANCE COMPANY OF AMERICA in the amount of ONE HUNDRED THOUSAND AND NO/100 ($100,000.00) DOLLARS with legal interest thereon from date of judicial demand until paid and for his cost of these proceedings, including his expert witness fees.
We delete the third paragraph of the judgment and add the following:
There be judgment in favor of GLORIA RANDALL and against THE NORTHERN ASSURANCE COMPANY OF AMERICA in the amount of SEVENTY-FOUR THOUSAND FIVE HUNDRED EIGHTY-FOUR AND 47/100 ($74,584.47) DOLLARS with legal interest thereon from date of judicial demand until paid and for her cost of these proceedings, including her expert witness fees.
As amended the judgment appealed is AFFIRMED at defendant's cost.
NOTES
[1] The defendant admitted liability to Floyd Myers who was a guest passenger in the Bronco. The defendant denied liability to Gloria Randall, who was also a passenger, on the basis she was an owner of the Bronco and had custody of the vehicle.
[2] Now LSA-C.C. art. 2324.1 (eff. January 1, 1985).
[3] The thoracic vertebrae are twelve vertebra which form the part of the spine in the region of the chest. They connect with the ends of the ribs. Schmidt's Attorneys Dictionary of Medicine, Vol. 4, pg. T-64 (1985).
[4] See Rollings v. Winn Dixie Louisiana, Inc., 439 So.2d 1132 (La.App. 4th Cir.1983); Abshire v. Dubois, 422 So.2d 611 (La.App. 3d Cir.1982), writ den., 427 So.2d 868 (La.1983); Ross v. Noble, 442 So.2d 1180 (La.App. 1st Cir.1983); Wilson v. Wal-Mart Stores, Inc., 448 So.2d 829 (La. App. 2d Cir.1984).
[5] LSA-R.S. 9:291. Suits between spouses

Unless judicially separated, spouses may not sue each other except for causes of action arising out of a contract or the provisions of Title VI, Book III of the Civil Code; restitution of separate property; for divorce, separation from bed and board, and causes of action pertaining to the custody of a child or alimony for his support while the spouses are living separate and apart, although not judicially separated.
[6] Art. 2351. Alienation of registered movables A spouse has the exclusive right to manage, alienate, encumber, or lease movables issued or registered in his name as provided by law.
[7] The record contained no bill from Dr. Massengale.